No. 33,032

THE PURE MILK PRODUCERS ASSOCIATION, INC., OF GREATER KANSAS CITY TERRITORY, *Appellant*, v. JOHN L. BRIDGES, doing business as Bridges Creamery Company, JOHN KNETTER et al., *Appellees*.

(68 P. 2d 658)

Opinion filed June 12, 1937.

*H. S. Roberts,* of Kansas City, and *John B. Gage,* of Kansas City, Mo., for appellant.

*Elmer E. Martin* and *Thomas M. VanCleave,* both of Kansas City, for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action brought by an agricultural coöperative association against a milk dealer and certain members of the association to enjoin the members from delivering milk to the dealer and to enjoin the dealer from purchasing milk of the members. Judgment was rendered denying plaintiff the relief sought and enjoining the plaintiff from interfering with the relations between the dealer and the defendant members. Plaintiff appeals.

The plaintiff is an agricultural coöperative association composed of dairymen living in the territory adjacent to greater Kansas City. Some members of the association live in Missouri and some in Kansas. The defendant, Bridges, is engaged in the business of furnishing milk to consumers in Kansas City, Kan.

The petition alleged plaintiff's organization and that its purpose was to promote ordinary marketing of milk produced by its members for human consumption in Kansas City, Kan., and Missouri; that the marketing agreements were in accordance with the statutes of Kansas; that Bridges was engaged in business as a distributor of milk in Kansas City, Kan., and that certain defendants, naming them, were members of the plaintiff association. The petition set out the contract of membership, which is as follows:

"THIS AGREEMENT, entered into by and between The Pure Milk Producers Association, Incorporated, of Greater Kansas City Territory, hereinafter called the association, and the undersigned, hereinafter called the member, witnesseth:

"That whereas, the member owns, possesses or has control of dairy cows and desires to have the milk from such cows, and such other cows as he may acquire or control at any time during the term hereof, sold and disposed of by or through the association.

"Now, therefore, in consideration of the premises and of the mutual obligations of the parties and in further consideration of the obligations of other members, each to the other, executing this and/or similar agreements, the parties hereto agree that:

"1. The member expressly agrees to coöperate with the milk distributors and consumers of milk, through their health officers by producing milk of the highest quality in accordance with ordinances, rules and regulations now in effect or to be enacted during the life of this agreement.

"2. The member warrants that his cows are tuberculin tested and are under state supervision. The member further agrees that he will continue to keep his cows under state supervision. Any violation of this paragraph shall make this agreement null and void as to the member making such violation.

"3. During the life of this agreement the member shall deliver to the association all milk produced by him for market, at such plant, platform or loading station, in such form as may be mutually agreed upon by the association and the member. It being understood that any milk for home consumption or special retail trade is not herein included.

"4. The member hereby constitutes the association his sole and exclusive agent for the purpose of handling or marketing such milk, together with the milk delivered by other members signing this and/or similar agreements and the association hereby agrees to market the milk in such a way as it shall deem best for the advantage of all persons signing this and/or similar agreements.

"5. The member agrees to pay an entrance fee of one dollar. The member further agrees that the association shall authorize the buyer to remit all money due the member for dairy products delivered by him directly to the member, less a commission not to exceed five cents (5¢) per hundredweight, which commission the member authorizes the association to collect and receive, and twenty-five cents (25¢) each year for a subscription to the *Kansas City Coöperative Dairyman.*

"6. The signing of this agreement shall constitute an application for membership in this association. This agreement shall become binding when the member qualifies and is issued a certificate of membership. The member agrees to conform to the bylaws of this association.

"7. The member agrees that the association may unite, associate, join, affiliate, or enter into a contract with any other company organized for similar purposes.

"8. This agreement shall continue in full force and effect after such notice is given until March 1, 193.., and remain in force from year to year thereafter, unless canceled by written notice of either of the parties, given between the 15th and 30th days of December, inclusive, of any year, which cancellation shall become effective on the first day of March following such notice."

The petition further stated that Bridges was not a member of the association and had no right to have milk delivered to him by members of the association without the plaintiff's consent, and that Bridges had manifested open hostility and malice toward plaintiff by making false representations and statements to members of plaintiff to the effect that the officers and directors of the association were not interested in the welfare of the members of the association and were not acting for the best interests of the members of the association, and that instead of getting better prices for milk produced by the members lowered the market price of milk; that as a result Bridges induced the other defendants named to conspire with him to violate the contracts with plaintiff and to refuse to deliver their milk supply to plaintiff and to deliver it to defendant Bridges, and that all of said defendants had conspired among themselves and with each other to interfere with the orderly marketing of milk covered by the contracts referred to and to defeat the purposes of the plaintiff and to prevent the contracts referred to from being carried out and to prevent the delivery of milk so produced for market to such person as the plaintiff had entered into contract with for the sale of such milk; that the plaintiff was without an adequate remedy at law by reason of its inability to properly measure damages sustained and which would be sustained in the breach of the contracts referred to. The plaintiff prayed that Bridges be restrained from purchasing milk from the other defendants named, members of the association, and that the other defendants be restrained from selling or delivering milk to Bridges, and that defendants be restrained from conspiring with each other to effect a breach of the contracts referred to and that the defendants other than Bridges be ordered to perform their contract with plaintiff,

"together with such other and further relief as to the court may seem just and equitable, and for the costs of this action."

Bridges answered admitting that he was doing business and was buying milk from some of the defendants named. He denied that plaintiff had any enforceable contract with any of the parties or had the legal authority to represent these parties or act for them or direct a disposition of milk produced by them; that the plaintiff maliciously and in an attempt to interfere with the operation of defendant's business was attempting to deprive Bridges of the benefits of his contract with the producers; the answer admitted that Bridges had stated that he would not purchase milk from or through the association, but alleged that these statements were not made because of any malice against the plaintiff but because of information possessed by defendant which led him to believe honestly that the president of the association was dishonest and not working for the best interests of the association; the answer admitted that Bridges said the association was not acting for the best interests of the milk producers, but alleged that he made this statement not to the producers named but to the president of the association personally; that the statement was not made out of malice, but as a statement of fact. He further filed an amended answer in which he stated that he had an investment of $50,000 in his plant; that sales connections between a distribution plant and a producer in the milk business was a valuable relationship; that it was necessary that the distribution plant know in advance the source of its supply; he denied that he had had any contractual relations with plaintiff, but that the plaintiff, with malice toward him, knowing that he had established contractual relations with the defendants named and for the purpose of injuring the defendant Bridges' business, falsely and fraudulently stated to the defendants that Bridges was probably unable to meet his financial obligations and that he was not honestly testing the butterfat content of the milk shipped to him by the other defendants.

The amended answer alleged that the plaintiff had called upon all of Bridges' shippers and made similar statements and representations to them, all of which were false, for the purpose of injuring the defendant's credit, damaging his business and causing him financial loss. Defendant prayed in his answer for an injunction against the plaintiff, its agents, servants and employees, forever enjoining it and its agents, servants and employees from calling upon any producers

shipping milk to the defendant and by words or acts seeking to disturb or interrupt the defendant's contractual relations with such producers and from stating directly or indirectly that the defendant was dishonest or had made dishonest tests or did not have the financial ability with which to meet his contractual obligations.

The other defendants all answered to substantially the same effect, first by a general denial, then by allegations that they had sold milk to Bridges for some years; that while they were satisfied with their contractual relations with Bridges the plaintiff, represented by its agents, induced them to sever their relations with Bridges and stated to defendants that if defendants would join with all of the other producers in the signing of an agreement by which plaintiff would be authorized to act as defendant's agent in the sale of their milk that the plaintiff would find for defendants a market for their product at a price greatly in excess of that which the defendants were then receiving; that relying on these statements defendants signed a paper presented to them by plaintiff's agents; that the plaintiff had failed to execute any agency conferred upon it by defendants; that because of plaintiff's failure to perform its contract defendants found a market with defendant Bridges and for many years continued their contractual relations with him; that the plaintiff had stated in substance to defendants that plaintiff desired to deprive Bridges of his milk supply and plaintiff offered to pay defendants from its funds the difference between the price of about forty cents per pound butterfat paid by the defendant Bridges and about thirty cents per pound butterfat paid by the cheese plant in Kansas City if these defendants would ship their milk to the cheese plant.

To these answers the plaintiff filed a general denial. At the trial of the case evidence covered a wide range of the dealings extending over a term of years between plaintiff association, the members who were defendants, and Bridges. The result was the judgment to which reference has already been made.

At this point attention is called to the eighth paragraph of the agreement heretofore quoted. It will be noted this paragraph provided that if any party desired to cancel the agreement, notice should be given between the 15th and 30th day of December in any year and that the cancellation would then become effective on the first day of March of the year following such notice.

After the trial of this case in the district court and while the

appeal was pending in this court all of the defendants except Bridges, who was not a party to this contract, took advantage of the above provision of the contract and severed their relationship. They are no longer members. It will be noted that the prayer of the petition of plaintiff is in effect for an enforcement of that contract. Obviously if the judgment should be reversed there could be no new trial of the case as to these defendants because their contract is no longer in existence. They have canceled it. We cannot order judgment for the plaintiff and order the contract enforced for the same reason.

The defendants have filed a motion to dismiss this appeal on the ground that the question is moot.

In *Plumbing Co. v. Journeymen Plumbers,* 87 Kan. 671, 125 Pac. 14, an action was brought to enjoin members of a local plumbers union from interfering with plumbers hired by plaintiff to work on the construction of a certain building. An injunction was granted by the trial court against certain defendants. An appeal was taken to this court by all the defendants. Before the case was reached on appeal, all the contracts for plumbing which were referred to in the petition were completed. In such a situation this court said:

"The occasion for restraining the Morrow Brothers from the unlawful acts complained of ceased before the controversy reached this court. Every question raised by the appeal is necessarily moot. The court would perform a useless function, therefore, to enter upon a discussion of the propositions argued or to attempt to decide questions of such serious importance in a case where no decision it might render could affect the rights of the parties and no order it might make could be enforced." (p. 673.)

In *Meyn v. Kansas City,* 91 Kan. 29, 136 Pac. 898, an action was brought seeking to enjoin the building of a viaduct. The injunction was denied, and plaintiff appealed. While the appeal was pending the viaduct was finished. This court dismissed the appeal because the question was moot. This court said:

"A judgment denying an injunction is sometimes reversed, notwithstanding the act sought to be enjoined has been performed, where, as in tax proceedings, the court has power to restore the original status. (*Bonnewell v. Lowe,* 80 Kan. 769, 104 Pac. 853.) This principle seems to have been applied where minor alterations in partitions in rented property were the subject of controversy. (*Moses v. Salomon,* 135 N. Y. Supp. 408.) Assuming that the court would have jurisdiction to command the removal of the viaduct here involved, which cost over $70,000, such an order is not to be thought of, and is not asked."

See, also, *Clewell v. School District,* 115 Kan. 176, 222 Pac. 74; also, *Anderson v. Cloud County,* 90 Kan. 15, 132 Pac. 996.

In this case it is difficult to see how any order this court should make would restore the status. When the contract pleaded was entered into it provided that the parties could cancel it at a certain time in any year. These defendants have taken advantage of that provision as they had a right to do.

Plaintiff meets this argument that the appeal should be dismissed by stating first that its action was brought for general relief as well as for an injunction and that the relief prayed for entitled plaintiff to damages for breach of the membership agreement. An examination of the prayer discloses that the only relief prayed for was an injunction against the producers and Bridges, unless the prayer for such other and further relief as to the court might seem equitable and just be so construed. We hold that this clause in the prayer is not open to such a construction. Furthermore, there are no allegations in the petition with reference to a measure of damages. The entire petition is clearly drawn for the purpose of stating a cause of action for an injunction. Plaintiff further argues that the appeal ought not to be dismissed because the cause of action pleaded was based on an alleged conspiracy between the producer defendants and Bridges to injure plaintiff and there is some evidence of a conspiracy, and argues further that the appeal ought not to be dismissed because the change in status of the parties was caused by the act of defendant producers themselves. Granting that these two statements be correct, that does not change the fact that there is no contract at this time which this court could order the producers to perform. Should plaintiff bring an action for damages against Bridges and the producers we would have a different question. In accordance with what has been said here it follows that the appeal as to the judgment denying an injunction against the producers should be and it is dismissed.

This leaves for our consideration that part of the judgment wherein plaintiff was enjoined from interfering with the contractual relations between Bridges and the producers. Plaintiff argues that this injunction should not have been granted. We will examine that order. The paragraph of the journal entry with which we are concerned is as follows:

"3. That the plaintiff, its officers, agents, servants and employees and anyone acting for and on behalf of the plaintiff be, and they are hereby forever

enjoined from hindering, harassing or molesting the defendant J. L. Bridges in his business relationships with the public, his customers to whom he sells and from whom he buys, by the circulation or communication of false statement; or by seeking to induce persons dealing with said defendant to sever or discontinue their business relations with said defendant, for the purpose of injuring the said defendant in the profitable conduct of his business."

In the first place plaintiff can hardly complain about being enjoined from molesting the defendant Bridges in his business relationships with the public and those to whom he sells and from whom he buys by the circulation or communication of false statements. No one would want to do that. There was, moreover, some evidence in this record that agents of plaintiff had told some of the defendant producers that Bridges had not tested their milk correctly. The trial court was warranted in concluding from this evidence, if it was believed, that plaintiff had made false statements about Bridges to his producers. Under the circumstances it was proper for the trial court to make such an order.

The injunction further enjoined plaintiff from seeking to induce persons dealing with Bridges to sever their business relations with him for the purpose of injuring him in the profitable conduct of his business. Plaintiff argues that the provisions of this order are so broad as to prevent plaintiff from going ahead with the business of organizing a coöperative association of dairymen in the territory where it is operating. We hold that this order does not admit of such an interpretation. The order only enjoins such acts as are done for the purpose of injuring Bridges in the profitable conduct of his business. This order was a proper one.

The judgment of the trial court enjoining plaintiff from interfering with the contractual relationship between Bridges and his producers is affirmed.