# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ORGANOVO HOLDINGS, INC., a Delaware Corporation | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 10536-VCL |
| GEORGI DIMITROV, | ) ) | |
| Defendant. | ) ) | |

## OPINION

Date Submitted: March 3, 2017
Date Decided: June 5, 2017

John L. Reed, Ethan H. Townsend, Harrison S. Carpenter, DLA PIPER LLP, Wilmington, Delaware; Grant P. Alexander, DLA PIPER LLP, Los Angeles, CA, *Counsel for Organovo Holdings, Inc.*

David L. Finger, FINGER & SLALINA, LLC, *Counsel for Georgi Dimitrov*.

**LASTER, Vice Chancellor.**

Defendant Georgi Dimitrov moved to vacate the entry of default judgment against him. His motion is granted.

## I.        FACTUAL BACKGROUND

The facts are drawn from the Verified Complaint (the "Complaint") and the materials submitted by the parties during post-default proceedings. A default judgment "deem[s] admitted all the well-pleaded facts in the complaint."[1] This decision also takes judicial notice of previous proceedings in a related action.

### A.        The Parties

Plaintiff Organovo Holdings, Inc. ("Organovo" or the "Company") is a Delaware corporation with its headquarters in San Diego, California. The Company designs and creates functional human tissues through its use of proprietary three-dimensional bio-printing technology. In July 2013, the Company listed its common stock on the New York Stock Exchange. In the months following its initial listing, the Company's stock price fluctuated widely. Between October 2013 and March 2014, the Company's stock price ranged between $5.55 per share and $12.75 per share, with an average trading price of $8.78.

Dimitrov is a man of mystery. In February 2014, he formed non-party Simeon Research, LLC ("Simeon"), a Delaware limited liability company. Shortly afterwards, he created a website for Simeon at the URL www.simeonresearch.com. He also secured for

---

[1] *Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586 (Del. 2008).

Simeon the Twitter handle @SimeonResearch. Simeon's Twitter bio described its feed as "long/short analytical equity research."[2]

Simeon engaged in a single activity: publishing negative information about the Company. In March and April 2014, Dimitrov published two reports in Simeon's name. Dimitrov called attention to these reports by posting sixty-five comments on Simeon's Twitter account.

**B.      The March Report**

In March 2014, Dimitrov posted a fifty-seven page report on Simeon's website titled "Organovo: Dissecting the Fairy Tale – Full Report" (the "March Report").[3] Dimitrov styled the March Report to look like work product from a professional equity research firm. He created official-looking letterhead and included a standard anti-reliance disclaimer. The report claimed to be the product of "hundreds of hours of intensive research from hundreds of journal publications, never-before seen primary sources, and extensive industry interviews."[4] It contained 189 footnotes citing public filings, news articles, and academic papers. It included numerous pictures and charts. Less professionally, it made extensive use of bold and underlined typeface, which this decision omits.

The beginning of the March Report summarized its key points.

---

[2] Dkt. 34, Ex. B.

[3] Dkt. 46, Ex. A.

[4] *Id.* at 3.

2

- "Organovo's bioprinting technology is not pivotal to tissue engineering or organ fabrication. Simeon Research publishes for the first time to the public the views expressed by Organovo's scientific founder: bioprinting – 'it's nothing, it's a stupid exercise.'"

- "Organovo has misled investors in multiple instances about its technology, its competitive position, and what it can deliver."

- "A number of companies and academics have developed bioprinters that have better capabilities than those of Organovo's NovoGen bioprinter."

- "Organovo has failed to deliver on its promises a number of times in the past, and has experienced a wash-out of material partnerships."

- "Organovo's liver tissue data is years behind competitors in the 3D liver toxicology market."

- "Organovo's intellectual capital has deteriorated significantly, as the founder exited and key scientistis left."

- "The scientific consensus on organ printing is that the media has hyperbolized it far and above reality while the public has bought in . . . ."

- "Organovo has experienced a rabid run-up in price that is incongruent with its real valuation, which we believe to be $1.35/share."[5]

The bulk of the March Report focused on the bioprinting industry's lack of commercial promise and the Company's technical inferiority to competitors in that field. It mixed in accusations that the Company's management had misled investors and engaged in self-dealing.

Only the last three pages of the March Report analyzed the value of the Company's stock. Much of this final section consisted of quotes from outside analysts.

---

[5] *Id.*

The only original valuation work appeared in the final two pages. Simeon ultimately valued Organovo based on an asset-based approach described in a single paragraph:

> We have demonstrated that Organovo lacks a competitive moat – its bioprinting technology is just a "stupid exercise" in the words of its scientific founder and it has been eclipsed by other bioprinting manufacturers while its liver tissue is inferior to the product offerings of other companies. Given this, we think it would be fairly easy to replicate every tangible asset on which Organovo's valuation is based – it thus makes a good basis for valuing the company. Bioprinters from a competing company. A warehouse. 35 scientists. $50M in cash. We will grant the exceedingly generous 5x multiple to Organovo's $13.5M in R&D spent since inception. All of this brings us to ~ $120M. At the current diluted share count, Organovo would be valued at $1.35/share. We think this is a fair value and even generous given the cascade of red flags about the company and its management.[6]

The Company responded to the March Report on its website. Among other things, the Company asserted that the report "was issued by or at the request of a short seller or short-sellers."[7]

## C.    The April Report

The March Report portended further publications. "This report encompasses roughly a third of the information Simeon Research has uncovered. Additional reports will follow in the coming weeks."[8] In April 2014, Simeon published a second report on its website titled "Bargaining with the Devil: How Organovo Used Fraudulent Brokers

---

[6] *Id.* at 56-57.

[7] Dkt. 46, Ex. B. at 23.

[8] Dkt. 46, Ex. A at 3.

and Promoters to Sell its Shares and Story" (the "April Report").[9] Dimitrov prepared the April Report in the same style as the March Report.

The April Report asserted that the Company was defrauding its investors. The first sentence of the April Report stated, "Organovo has carried out one of the most successful penny stock promotions currently listed on a major exchange."[10] The April Report summarized its support for this assertion as follows:

- "Organovo paid millions to brokers with fraudulent histories to promote shares to individual investors."

- "Organovo paid for stock promotion services without disclosing the payments – it enlisted ProActive Capital, which has been accused of paying a cadre of authors to write promotional articles covering client stocks without SEC-required disclosures."

- "During the course of this stock promotion, we believe that pro-Organovo articles may have been published in exchange for compensation without any disclosure."

- "Organovo has spent nearly 3x as much on selling shares and promoting its stock as it has on Research & Development since the company was founded."[11]

The April Report claimed that Simeon had "submitted [its] findings to the SEC and look forward to their response."[12] It touted that Organovo's stock price had fallen 9.3% since the publication of the March Report.

The April Report responded to the Company's claim that Simeon was working on behalf of short-sellers. It stated: "We want to make unequivocally clear that our research

[9] Dkt. 46, Ex. B.

[10] *Id.* at 1.

[11] *Id.* at 3.

[12] *Id.*

5

and publications are in no way whatsoever the result of a 'request' or compensation by any third party. Our reports represent Simeon Research's original investigations and analysis. . . . [W]e stand by our work and believe in its accuracy."[13] The April Report also claimed that "Organovo has, in the past, attempted to smear critical research of its valuation by calling negative views 'short and distort' tactics."[14]

## D.    The Tweets

Dimitrov called attention to Simeon's two reports through the Company's Twitter account. After releasing the reports, Simeon sent out at least sixty-five tweets, all of which concerned the Company. For example, two tweets on April 8, 2014 stated, "Simeon Research reiterates $1.35 price target for Organovo shares . . . ." and "[Organovo] is down 4% today and 12% since our first report in March. We believe downside exists to $1.35/share."[15]

---

[13] *Id.*

[14] *Id.*

[15] Compl. ¶ 26.

6

### E.    The Simeon Action

On April 21, 2014, the Company filed a lawsuit against Simeon in this court (the "*Simeon* Action").[16] Because the Company did not yet know who controlled Simeon, the Company included "unnamed Does 1-25" as defendants.

The complaint alleged that the March and April Reports (together, the "Simeon Reports") contained numerous false or misleading statements.[17] The Company specifically cited the following:

- "[Organovo] has failed to achieve renewal from its 2 key pharmaceutical partners and secured fluff PR pieces instead."

- "No researcher will shell out $200,000 to buy Organovo's bioprinter when they can make a comparable or better bioprinter on their own for a fraction of the price. Organovo has placed 6 of these bioprinters with academic centers since 2009, or, 1 bioprinter per year. And they didn't receive a cent – they loaned the printers at no cost."

- "Leapfrogging Organovo, researchers at Scotland's Herriot-Watt University have made a revolutionary breakthrough in tandem with privately-held Roslin Cellab by bioprinting human embryonic stem cells with high levels of viability (>95% with identical physiology post-printing) using a modified MakerBot printer. The work, unlike the claims of Organovo, has been published in the journal Biofabrication – it has been called "the greatest breakthrough in 3D bioprinting to date.""

- "Keith Murphy [the Company's CEO] tells investors that Organovo can leverage its platform to achieve partnership deals that bring in $10,000,000-$30,000,000 per deal plus a 3%-7% royalty. That is 7 times to 22 times greater than Organovo's largest deal-to-date, a deal that has not been renewed."

- "The company publicizes any thread of good news while sweeping detrimental events under the rug without mention."

---

[16] *See Organovo Hldgs. Inc. v. Simeon Research, LLC*, C.A. 9563-VCL (Del. Ch. 2014)

[17] *Simeon* Action, Dkt. 1 (the "Simeon Complaint").

- "Of course, Organovo knows [that it did not develop the first bioprinter], because it worked with nScrpyt to develop its own bioprinter."

- "[E]ither Organovo's management made dubious claims to raise money from investors, or its employees and technology failed to achieve their targets."

- "Organovo has a history of serial dilution and insider sales in the last half-year exceed the amount of money the company invested in Research & Development."

- "Back in 2012, every private investor in Organovo sold their shares into the market, liquidating 32.1M shares (99.7% of their holdings) at a blended price of $3.02/share."[18]

- "[The fact that] Organovo has spent triple its entire R&D budget since inception on raising money from small-time investors and stock promotion demonstrates that Organovo is more penny-stock promotion than legitimate company."

- "Organovo has spent nearly three times as much money ($36.5 million) compensating its brokers and discounting shares in a follow-on as it has on Research and Development ($13.5 million) since the Company's inception."

- "ProActive provided Organovo a number of stock promotion services in exchange for Organovo's business – many had none of the legally-required disclosures."

- "ProActive Capital and DreamTeamGroup have absolutely no disclosures on any of their operated websites that they were compensated by Organovo for their promotions."

- "Organovo paid these brokers more than $1 in cash, stock, and warrants for every $1 raised from investors."[19]

The Company brought claims for libel, libel per se, and tortious interference with prospective economic advantage. The Company sought an order "(i) enjoining Defendant from making or publishing any further false and defamatory statements regarding

---

[18] *Id.* ¶ 15.

[19] *Id.* ¶ 17.

Plaintiff, and (ii) compelling Defendant to remove any and all defamatory and violative statements from its website and Twitter account."[20]

After suing Simeon, the Company identified Dimitrov by subpoenaing Simeon's registered agent. On May 15, 2014, the Company served Dimitrov with a subpoena at his apartment in Alexandria, Virginia.[21]

## F.    Simeon Defaults.

Dimitrov caused Simeon to retain counsel, and Simeon moved to dismiss the *Simeon* Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief could be granted.[22] Then, on June 10, 2014, Simeon's counsel moved to withdraw, stating that his client "has ceased communicating with counsel."[23] On June 16, I issued an order to show cause directing Simeon to file any opposition to the motion to withdraw by a specified date. The order warned Simeon that "[i]f no action is taken by this date, the Motion to Withdraw will be granted."[24] Simeon did not respond. On July 17, I granted the motion to withdraw.[25]

---

[20] *Id.* ¶ 60.

[21] *Simeon* Action, Dkt. 15.

[22] *Simeon* Action, Dkt. 10.

[23] *Simeon* Action, Dkt. 18.

[24] *Simeon* Action, Dkt. 20.

[25] *Simeon* Action, Dkt. 24.

9

From that point on, Simeon did not participate in the litigation. The Company asked the court to deny Simeon's motion to dismiss and enter a default judgment. I agreed in part and denied the motion to dismiss. I declined to enter a default judgment and instead provided Simeon twenty-one days to answer the complaint. Simeon again did not respond.

On August 26, 2014, the Company renewed its motion for default judgment. By order dated September 3, 2014, I entered a default judgment against Simeon in the form requested by the Company. The final order permanently enjoined Simeon from "making any further defamatory statements about [the Company]" or "publishing or posting any libelous statements about Plaintiff anywhere on the Internet." Simeon was also ordered to "immediately remove or cause to be removed any and all libelous statements from its website, Twitter account, or any other public websites," including the Simeon Reports and all posts on Simeon's Twitter account.[26]

## G.     This Action

On January 13, 2015, the Company filed this action against Dimitrov. The Company contended that Dimitrov acted through Simeon and used the entity "solely for the purpose of allowing him to shield his identity and assets, and to create the appearance that a legitimate research company was challenging the business of [the Company]."[27]

---

[26] *Simeon* Action, Dkt. 30.

[27] Compl. ¶ 2.

The factual allegations of the Complaint were substantially identical to those alleged in the *Simeon* Complaint.

The Company asserted for claims libel, libel per se, tortious interference with prospective economic advantage, and negligence. The Complaint sought an injunction substantially identical to the one asked for and obtained by default in the Simeon Action:

> [T]he court should enter a permanent injunction (i) compelling Dimitrov to remove any and all defamatory and violative statements from any website he maintains and the @SimeonResearch Twitter account (ii) enjoining Dimitrov from forming or creating new entities with the purpose of preparing and/or publishing any false and defamatory statements regarding [the Company.], and (iii) enjoining Defendant from forming or creating new entities with the purpose of preparing and/or publishing any false and defamatory statements regarding [the Company.][28]

Despite seeking this relief, the Company acknowledged in its Complaint that Simeon's website had been taken down and that all of Simeon's tweets about the Company had been removed.[29]

## H.   Dimitrov Defaults.

The Company attempted to serve Dimitrov at his last known address in Alexandria, Virginia. Someone accepted delivery, then returned the documents to UPS, suggesting that Dimitrov either no longer resided there or was evading service. The Company next attempted to contact Dimitrov via his last-known phone number, but he did not answer and his voicemail was full. The Company also e-mailed Dimitrov at his last known e-mail address, but Dimitrov did not respond. The Company then searched

---

[28] *Id.* ¶ 69.

[29] *Id.* ¶¶ 5, 26.

public records and sent a process server to an address in New York City, but a building representative told the process server that Dimitrov did not reside there.[30]

The Company next sought and received permission to effectuate service by publication. The order authorizing service by publication directed Dimitrov to appear on May 18, 2015. It warned that "failure to appear shall be cause for entry of judgment by default."[31] The Company published the required notice on March 20, March 27, and April 3, 2015.

On May 13, 2015, over a month after the last notice by publication, Dimitrov e-mailed the Company's counsel from a new e-mail address. His email stated:

> Hello,
>
> My name is Georgi Dimitrov. I recently discovered through a posting on Delaware Online that Organovo has filed a civil suit against me due to my publications through my LLC, Simeon Research. I am writing first to ask the purpose of the suit, given my impression that by conceding the suit against Simeon Research and removing all research material and statements regarding Organovo the matter would be concluded.
>
> Second, I am writing to inform you that I am currently in Europe, and due to personal matters am wholly unable to be present in court on May 18th. Therefore, I hope that a mutually favorable resolution can be reached, and in the meanwhile, I hope that you would see fit to at least delay the court date.[32]

Dimitrov did not contact the court.

---

[30] Dkt. 5.

[31] Dkt. 7.

[32] Dkt. 10, Ex. A.

12

By letter dated May 15, 2015, Organovo submitted Dimitrov's letter to the court and asked to proceed with the hearing as scheduled. The Company explained the lengths to which it had gone to serve Dimitrov and provide notice of the hearing. The Company also discussed the timing of Dimitrov's email:

> In his May 13 e-mail, Mr. Dimitrov claims to have "recently discovered through a posting on Delaware Online that Organovo has filed a civil suit against me due to my publications through my LLC, Simeon Research." On this point, we note that Organovo arranged for the Order to be published in The News Journal on March 20, March 27, and April 3, 2015. Thus, Mr.Dimitrov's e-mail came more than 40 days after the most recent date the Order was published in The News Journal.[33]

The Company inferred that Dimitrov "has gone through great effort to avoid learning the 'purpose' of this lawsuit."[34] The Company cited precedents in which Delaware courts had scheduled hearings and entered default judgments when parties failed to attend.[35]

The Company provided a copy of its letter to Dimitrov using the email address that he had used to contact the Company. From that point forward, copies of all filings in this case were sent to Dimitrov at that email address. Dimitrov did not respond to the Company's letter.

The hearing went forward as scheduled on May 18, 2015. Dimitrov did not appear. I held that he had defaulted.

---

[33] Dkt. 10, at 3-4 (internal citations omitted).

[34] *Id.* at 4 n.1.

[35] *Id.* at 5.

## I. Post-Default Proceedings

Despite ruling that Dimitrov was in default, I did not enter the form of default judgment that the Company had proposed. I instead instructed the Company's counsel to brief two matters: (i) the amount of damages, and (ii) whether the requested injunctive relief constituted an unconstitutional prior restraint on future speech.

By letter dated September 16, 2015, the Company submitted a Proposed Order and Final Judgment of Default (the "Proposed Final Order"). The Proposed Final Order included a request that Dimitrov disgorge his trading profits. This was the first time that the Company had requested this relief. Lacking any public records reflecting Dimitrov's trades, the Company sought an order compelling Dimitrov to provide them. Dimitrov did not oppose the request, and I granted it.

The Company commendably provided thorough and evenhanded briefing on the constitutional issues raised by its request for injunctive relief. The Company proposed a narrowly tailored injunction that permanently enjoined Dimitrov from republishing the content of the Simeon Reports and tweets. The Company agreed that in any future proceeding to enforce the injunction, the Company would bear the burden of establishing Dimitrov's noncompliance, which Dimitrov could rebut by demonstrating that the defamatory statements had since become true or were not defamatory.

The Company was less modest in its damages request. The Company claimed general damages equal to the decline in the Company's market capitalization during the twenty-six day period when Dimitrov published the Simeon Reports and tweets. During that period, the Company's stock traded at an average price of $7.79 per share, compared

to $9.67 in the thirty days preceding his publications. The Company's damages theory implied that Dimitrov was solely responsible for the aggregate decline in the Company's stock price.

The Company's damages theory yielded general damages of $174,311,980.83. That eye-popping figure would rank among the largest recoveries that this court has awarded. In the alternative, the Company proposed using an index to factor out general market and industry conditions. This marginally more conservative approach generated a still-massive damages award of $134,291,463.00.[36]

The Company did not stop at general damages. It also requested a large amount of special damages. The Company claimed harm from its "impaired ability to raise capital" after Dimitrov's publications. When Dimitrov published the Simeon Reports and tweets, the Company was in discussions with an investment bank about raising $60 million in financing. The Company claimed, without elaboration, that Dimitrov's actions "caused Organovo to put the brakes on the planned financing."[37] Instead, the Company raised $16.6 million by selling shares in below-market offerings of common stock. The offerings reduced the number of shares available for issuance under the Company's shelf registration statement, which forced the Company to file another shelf registration. The Company later closed on an underwritten public offering that raised gross proceeds of $46.1 million. The Company claimed that Dimitrov should be held responsible for $13.9

---

[36] Dkt. 20, at 31-37.

[37] *Id.* at 39.

million, representing the difference between the $60 million in financing that the Company had discussed a year earlier and the $46.1 million that the Company raised in its underwritten offering.

The Company also identified $70,000 in public relations costs incurred responding to Dimitrov's publications. The Company's total request for special damages equaled $13,970,000.

During a hearing on February 4, 2016, I choked on the Company's aggregate damages request and asked the Company to reconsider the magnitude of the damages it was seeking. On May 2, the Company submitted a revised damages request. The Company reduced its request for general damages to $38,442,781. The Company also limited its request for special damages to the $70,000 in public relations costs. The Company again requested disgorgement of Dimitrov's trading profits, which it calculated as amounting to $33,235.65. The Company continued to request a permanent injunction against the republication of the Simeon Reports and tweets.

## J.  Dimitrov Enters a Limited Appearance.

On June 27, 2016, before this court had entered a final order, Dimitrov retained the counsel that originally represented Simeon in the *Simeon* Action. Through counsel, he entered a limited appearance and moved to vacate the default judgment. He argued that the judgment was void because the court lacked subject matter jurisdiction over the dispute and could not exercise personal jurisdiction over him. On March 3, 2017, the court heard oral argument.

16

## II.     LEGAL ANALYSIS

The entry of a default judgment does not prevent the defaulting party from appearing and contesting the default. "A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds . . . ."[38] That is what Dimitrov has done here.

Court of Chancery Rule 55(c) permits the court to set aside a default on the grounds identified in Rule 60(b). Under Rule 60(b)(4), the court may vacate a judgment if "the judgment is void." A judgment is void if the court entering the default judgment lacked subject matter jurisdiction or could not exercise personal jurisdiction over the defendant.[39] Although Dimitrov has challenged both the exercise of subject matter jurisdiction and the assertion of personal jurisdiction, this decision only reaches the former issue.

The Court of Chancery can exercise subject matter jurisdiction only when a case falls into one of three buckets.[40] First, jurisdiction exists if a plaintiff states an equitable

---

[38] *Ins. Corp. of Ireland v. Compagnie des Bauxietes de Guinee*, 456 U.S. 694, 706 (1982).

[39] *See, e.g.*, *Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Gp. (Hldg.)*, 2012 WL 4847089, at *6 (Del. Ch. Oct. 11, 2012) (Strine, C.), *aff'd*, 67 A.3d 373 (Del. 2013); *Ford v. Pep Boys*, 1989 WL 16987, at *1 (Del. Super. Feb. 21, 1989); *Read v. Walls*, 1986 WL 628580, at *2 (Del. Ch. Jan. 16, 1986); *accord* 10 Charles Alan Wright et al., *Federal Practice and Procedure* § 2695 (3d. 1998) ("The principal basis for an attack on a default judgment under Rule 60(b)(4) asserts that it is void for lack of jurisdiction.").

[40] *See generally Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).

claim.[41] Second, jurisdiction exists if a plaintiff requests equitable relief and there is no adequate remedy at law.[42] Third, jurisdiction exists by statute.[43] Additionally, the clean-up doctrine provides that if this court would have equitable jurisdiction over a part of a controversy, then it can address the remaining portions of the controversy as well.[44]

"Equitable jurisdiction must be determined from the face of the complaint at the time of filing, with all material factual allegations viewed as true."[45] "In deciding whether or not equitable jurisdiction exists, the Court must . . . focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[46] "Chancery jurisdiction is not conferred by the incantation of magic words. . . . If a realistic evaluation leads to the conclusion that an adequate remedy is available, this court . . . will not accept jurisdiction over the matter."[47]

---

[41] *See* 10 *Del. C.* § 341.

[42] *See* 10 *Del. C.* §§ 341, 342.

[43] *See, e.g.*, 8 *Del. C.* § 111; 6 *Del. C.* §§ 17-111, 18-111.

[44] *See generally Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 149 (Del. Ch. 1978).

[45] *Int'l Bus. Mach. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991).

[46] *Candlewood*, 859 A.2d at 997.

[47] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) (Allen, C); *accord Comdisco*, 602 A.2d at 78 ("[A] judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery."); *Cochran v. F.H. Smith Co.*, 174 A.119, 121 (Del. Ch. 1934) (Wolcott, C.) ("It appears sometimes to be thought that if fraud be present in any situation the *open sesame* has

18

The Complaint asserts common law claims for libel, tortious interference with prospective economic advantage, and negligence. None of these are equitable claims, and the complaint does not invoke a statute that confers subject matter jurisdiction on the court. Consequently, this court only has subject matter jurisdiction over the case if the Complaint sought a viable equitable remedy.

The Company has cited two equitable remedies. The first is a permanent injunction against future defamation. The second is an order compelling Dimitrov to disgorge his profits. On the facts of this case, neither provided a basis for subject matter jurisdiction. The default is therefore vacated.

## A.    Injunctive Relief

The Complaint alleged that Dimitrov defamed the Company and sought a permanent injunction barring Dimitrov from engaging in future acts of defamation. Whether that request for relief supported the exercise of equitable jurisdiction necessitates a review of three strands of authority: (i) the general limitation on the availability of an injunction when an adequate remedy exists at law, (ii) the specific limitation on the ability of a court sitting in equity to enjoin defamatory speech, and (iii) the narrow exceptions to the general rule against injunctions in defamation cases. On the facts presented, the Company's request for a permanent injunction against future defamation did not provide a sufficient basis for exercising equitable jurisdiction.

---

been found upon the pronouncing of which the doors of equity are flung wide apart. That is a misconception.").

19

## 1. An Adequate Remedy At Law

Generally, "a party injured as a result of a tort has a complete and adequate remedy at law in the form of an action for damages[.]"[48] Defamation is a common law tort.[49] This court lacks jurisdiction "to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."[50] Damages are a standard remedy for defamation.[51]

In this case, a realistic evaluation of the Complaint demonstrates that the Company had an adequate remedy at law in the form of money damages. The Complaint alleged that Dimitrov's defamatory statements negatively affected the Company's stock price.

---

[48] *Hughes Tool Co. v. Fawcett Publ'ns, Inc.*, 297 A.2d 428, 432 (Del. Ch. 1974), *rev'd on other grounds*, 315 A.2d 577 (Del. 1974); *see also Gelof v. Prickett, Jones & Elliot, P.A.*, 2010 WL 759663, at *1 (Del. Ch. Feb. 19, 2010) (Strine, V.C.) (finding that a claim for professional negligence "can be completely remedied by legal relief"); *Cochran*, 174 A. at 121 ("[A] court of the United States will not sustain a bill in equity to obtain only a decree for the payment of money by way of damages, when the like amount can be recovered at law in an action sounding in tort . . . .") (quoting *Buzard v. Houston*, 119 U.S. 347, 352 (1886)).

[49] *See Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).

[50] 10 *Del. C.* § 342.

[51] *See, e.g.*, *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1178 (Del. 2000) (affirming jury determination of liability but remanding "for a new trial limited to damages"); *Spence v. Funk*, 396 A.2d 967, 970-71 (Del. 1978) (discussing availability of general and special damages for various forms of defamation); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 23 (1990) ("Imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.") (citation omitted); Dan V. Dobbs, *The Law of Remedies* 265 (2d ed. 1993) [hereinafter *Law of Remedies*] ("Remedies for libel and slander are traditionally damages remedies."). *See generally* 2 Rodney A. Smolla, *Law of Defamation* §§ 9.01-9.65 (2d ed. 2012) (reviewing the often complex interaction between common law rules and constitutional doctrine governing damages awards in defamation cases).

20

The Company asked for an award of damages equal to the aggregate value of the decline in its market capitalization. Setting aside whether that was an appropriate quantum of relief, it demonstrated that the Company's injury could be remedied through a monetary award.

The Company's request for injunctive relief was forward-looking. Although the Company's past harm could be remedied with money, the Complaint sought an injunction against further acts of defamation. An injunction against future wrongdoing is not generally available.[52] For forward-looking relief to be warranted, the plaintiff must establish a "reasonable apprehension of a future wrong."[53]

The Complaint did not meet this test. After the *Simeon* Action, Dimitrov stopped defaming the Company. He complied with this court's order by removing the Simeon Reports and the Simeon Tweets and not publishing any additional defamatory material.[54]

---

[52] *See Young v. Red Clay Consol. Sch. Dist.*, __A.3d__, 2017 WL 2271390, at *53 (Del. Ch. May 24, 2017) ("A permanent injunction against future conduct is not warranted simply because a court has found past conduct illegal."); *Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003) ("The court must presume that [parties] will respect any decision rendered by any competent court of this case."); *accord Del. Bldg. & Constr. Trades Council v. Univ. of Del.*, 2014 WL 2218730, at *2 (Del. Ch. May 29, 2014) (holding that injunctive relief was not warranted where a plaintiff "merely contends that, because the Defendants have purportedly not complied with [a] statute in the past, they will continue this alleged pattern of non-compliance" after a court order); *Reeder v. Del. Dep't of Ins.*, 2006 WL 510067, at *16 (Del. Ch. Feb. 24, 2006) (Strine, V.C.) ("There is no justification on this record for an injunction requiring the Insurance Department to do what it must do in any event— comply with applicable statutory constraints on its behavior.").

[53] *McMahon*, 532 A.2d at 606.

[54] Compl. ¶¶ 5, 26.

21

When the Company filed suit, there was no "reason to believe that [Dimitrov would] continue his wrongful course of conduct."[55]

Judged under traditional equitable standards, therefore, the Complaint's request for an injunction did not provide a basis for subject matter jurisdiction. That conclusion becomes all the more clear when evaluated under the special rules that apply to requests for injunctions against future defamatory statements.

### 2.    The No-Injunction Rule

The ability of a court to issue injunctive relief is even more constrained in a defamation case than in a garden-variety tort case or breach of contract case. Traditionally, the reason for the special rule was jurisdictional. Today, the rule is primarily remedial but also rests on the importance afforded to the constitutional protections of speech.

Historically, equity declined to exercise jurisdiction over a claim for defamation based on a prayer for injunctive relief. This broadly held view was crystallized in the

---

[55] *Weinger v. Miller*, 1990 WL 54915, at *1-2 (Del. Ch. Apr. 27, 1990).

"traditional maxim that 'equity will not enjoin a libel.'"[56] A more historically accurate formulation was that "equity has no jurisdiction to enjoin a libel."[57]

The no-injunction rule originated in England during the eighteenth century, when one of Parliament's major victories in the battles for freedom of the press was "to give jurors, rather than judges, the power to determine whether publications were in fact defamatory."[58] By the end of the eighteenth century, it was settled law in England that a

---

[56] Smolla, *supra*, § 9.85; *accord* 2 Robert D. Sack*, Sack on Defamation: Libel, Slander and Related Problems* § 10.6.1 (4th ed. 2010) ("One principle long adhered to in defamation cases is that courts will not enjoin libels."). *See generally* David S. Ardia, *Freedom of Speech, Defamation, and Injunctions*, 55 William & Mary L. Rev. 1, 18 (2013) [hereinafter *Freedom of Speech*] ("The no-injunction rule has been a fixture of Anglo-American law for more than three centuries.").

[57] *Am. Malting Co. v. Keitel*, 209 F. 351, 356 (2d Cir. 1913); *see also Inland Steel Prods. Co. v. MPH Mfg. Co.*, 25 F.R.D. 238, 243 (N.D. Ill. 1959); *Palmer v. Travers*, 20 F. 501, 501 (C.C.S.D.N.Y. 1884); *Sid Dillon Chevrolet-Oldsmobile-Pontiac, Inc. v. Sullivan*, 559 N.W.2d 740, 747 (Neb. 1997); *Venturelli v. Trovero*, 105 N.E.2d 306, 308 (Ill. App. Ct. 1952); *Lawrence v. Atwood*, 295 S.W.2d 298, 300 (Tex. Ct. Civ. App. 1956); *West Willow Realty Corp. v. Taylor*, 198 N.Y.S.2d 196, 198 (Sup. Ct. 1960).

[58] Michael I. Meyerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and the Separation of Powers*, 34 Ind. L. Rev. 295, 306 (2001) [hereinafter *Rediscovering the Link*]. Until 1641, speech was highly regulated by the Star Chamber, "an unhealthy hybrid of legislature and court, issuing regulations and trying and sentencing those accused of violating its laws." *Id.* at 299. After its abolition, Parliament increasingly pushed back against judicial suppression of political speech in the lead-up to the Glorious Revolution. One example was *Henry Carr's Case*, where the King's Bench asserted common law authority to restrain the publication of a periodical before a conviction for criminal libel. *See Trial of Henry Carr* (1680) 7 How. St. Tr. 1111. The House of Commons impeached the judge, declaring that the ruling was "most apparently contrary to all justice, in condemning not only what had been written without hearing the parties, but also all that might for the future be written on that subject." *Impeachment of Scroggs* (1680) 8 How. St. Tr. 198. *See generally Rediscovering the Link*, *supra*, at 307-08; Stephen A. Siegel, *Injunctions for Defamation,*

court of equity had no jurisdiction to adjudicate a defamation claim.[59] American courts adopted the English approach.[60] In his influential treatise on equity, Justice Story explained that "matters of this sort [*i.e.,* defamation] do not properly fall within the jurisdiction of Courts of Equity to redress; but are cognizable, in a civil or criminal suit, at law."[61]

The merger of the historically separate courts of law and equity undercut the traditional allocation of jurisdiction over defamation to the law courts, first in England

---

*Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 676-77 (2008) [hereinafter *Clarifying Lens*].

[59] *See Gee v. Pritchard* (1818) 36 Eng. Rep. 670, 674; 2 Swans. 403, 413 (Ch.) ("It will not be necessary to trouble you [to argue that the letters are defamatory]. The publication of a libel is a crime; and I have no jurisdiction to prevent the commission of a crime."); John Eden, *A Treatise on the Law of Injunctions* 317 (1821) ("So little has it even been supposed that such a jurisdiction [to enjoin libels] . . . belonged to the court of Chancery that it would be difficult to find any authority in which it has been in terms denied."); *see also Clarifying Lens*, *supra*, at 694 ("The sentiment [that equity lacked jurisdiction to enjoin defamation] passed from [Chancellor] Hardwiche to Chancellors Erskine and Eldon and on to other judges and commentators."); *Rediscovering the Link*, *supra*, at 310 ("While a few cases implied that equity could, in fact, enjoin a libelous publication, these cases were quickly dismissed as aberrational throwbacks to a discredited era."); Roscoe Pound, *Equitable Relief Against Defamation and Injuries to Personality*, 29 Harv. L. Rev. 640, 645 (1916) [hereinafter, *Injuries to Personality*] (acknowledging that *Gee v. Pritchard* "foreclosed the matter" even though in the author's view "it was by no means settled by authority").

[60] *See, e.g., Francis v. Flinn*, 118 U.S. 385, 388-89 (1886); *Edison v. Thomas A. Edison, Jr., Chem. Co.*, 128 F. 957, 963 (C.C.D. Del. 1904); *Reyes v. Middleton*, 17 So. 937, 939 (Fl. 1895); *Raymond v. Russell*, 9 N.E. 544, 544 (Mass. 1887); *Flint v. Hutchinson Smoke-Burner Co.*, 19 S.W. 804, 806 (Mo. 1892); *Allegritti Chocolate Cream Co. v. Rubel*, 83 Ill. App. 558, 565 (1898); *Brandreth v. Lance*, 8 Paige Ch. 24, 26 (N.Y. Ch. 1839). *See generally Freedom of Speech*, *supra*, at 21; *Clarifying Lens*, *supra*, at 710.

[61] 2 Joseph Story, *Commentaries on Equity Jurisprudence* 263 (1843).

and then in the United States. After England unified its separate court systems in 1873, English courts began to issue permanent injunctions in defamation cases *after* a jury had found the defendant liable, but "the judge could enjoin no more than what the jury had found to be defamatory."[62] Although this step was initially controversial, by the end of the nineteenth century English courts also were willing to issue preliminary injunctions pending the jury's decision.[63]

During the late nineteenth and early twentieth centuries, many American jurisdictions also merged their separate systems of law and equity.[64] American courts, however, maintained the no-injunction rule in the face of contrary British practice.[65] The

---

[62] *Clarifying Lens*, *supra*, at 709 (internal citations and quotations omitted); *see* W. Blake Odgers, *A Digest of the Law of Libel and Slander* 13-14 (1881) ("No injunction can be obtained to prohibit the publication or republication of any libel, or to restrain its sale. The matter must first go before a jury . . . [T]he courts, whether of Law or of Equity, cannot, till after verdict issue any injunction.").

[63] *Clarifying Lens*, *supra*, at 709 n.289; William D. Lewis, *English Cases on the Restraint of Libel by Injunction Since the Supreme Court Judicature Act, 1873*, 51 Am. L. Reg. 322, 330 (1903) (noting that since the end of the nineteenth century, "no one has questioned the power of the court under the Judiciary Act to grant an interim injunction to restrain a libel. The power has been repeatedly asserted.").

[64] Unlike Delaware, most American states never maintained separate courts but rather distinct dockets, one for actions at law and the other for proceedings in equity, both of which were administered by the same court. *See* Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 Wash. L. Rev. 429, 448-49 (2003); Morton Gitelman, *The Separation of Law and Equity and the Arkansas Chancery Courts: Historical Anomalies and Political Realities*, 17 Ark. L. Rev. 215, 235 (1995). The federal courts exemplified this approach until 1938, when the adoption of the Federal Rules of Civil Procedure resulted in the creation of today's "civil action." *See* Fed. R. Civ. P. 2 ("There shall be one form of action to be known as 'civil action.'").

[65] *See Clarifying Lens*, *supra*, at 715; *Freedom of Speech*, *supra*, at 21.

leading decision grounded the continuing adherence to the no-injunction rule on traditional equitable principles:

> Charges of slander are peculiarly adapted to and require trial by jury; and exercising, as we do, authority under a system of government and law which by a fundamental article secures the right of trial by jury in all cases at common law, and which by express statute declares that suits in equity shall not be sustained in any case where a plain, adequate, and complete remedy may be had at law, as has always heretofore been considered the case in causes of libel and slander[,] we do not think that we would be justified in extending the remedy of injunction to such cases.[66]

In the federal courts and the majority of states that unified their systems, courts recast the earlier rule about equity lacking jurisdiction over a defamation claim as a principle that equity would not grant injunctive relief to restrain a libel.[67] In the minority of states that

---

[66] *Kidd v. Horry*, 28 F. 773, 776 (Bradley, Circuit Justice, C.C.E.D. Pa. 1886).

[67] *See, e.g.*, *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987) ("The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.") (internal quotations omitted); *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967) ("There is usually an adequate remedy at law which may be pursued in seeking redress from harassment and defamation."); *Oorah, Inc. v. Schick*, 2012 WL 3233674, at *4 (E.D.N.Y. Aug. 6, 2012) ("Oorah may seek damages if the School commits libel or slander; as it failed to demonstrate the inadequacy of that remedy, equitable relief was inappropriate."); *Greenberg v. DeSalvo*, 229 So. 2d 83, 86 (La. 1969) (noting that one of the rationales behind the no-injunction rule is that "there is an adequate legal remedy, either by an action for damages or by criminal prosecution"); *Mescalero Apache Tribe v. Allen*, 469 P.2d 710, 711 (N.M. 1970) ("[A] court of equity will not enjoin threatened commission of libel or slander where no continuing irreparable injury not compensable in a court of law is shown."); *Schmoldt v. Oakley*, 390 P.2d 882, 885 (Okla. 1964) ("[E]quity will not restrain libel or slander . . . in the absence of acts of conspiracy, intimidation, or coercion, because the party allegedly wronged has an adequate remedy at law.").

In reformulating the rule, courts sometimes noted that its traditional underpinning as a limitation on jurisdiction no longer applied in a merged law-and-equity court. *See Greenberg*, 229 So. 2d at 85 ("Although equitable remedies in the past have sometimes

26

retained the division between law and equity, courts almost universally adhered to the traditional rule against equity exercising jurisdiction over a defamation claim.[68]

The protection for freedom of speech in the federal and state constitutions provided additional justifications for American resistance to the issuance of injunctions in

---

been denied in terms of lack of jurisdiction, the jurisdictional rationale is technically inaccurate"). Others continued to rely (inaccurately) on the jurisdictional foundation. *See, e.g.*, *Starns v. Success Portrait Co*. 28 F. Supp. 711, 711 (E.D. Tenn. 1939); *Atwood*, 295 S.W.2d at 300; *see generally Freedom of Speech*, *supra*, at 21-22 ("Judges continued to deny requests for injunctions targeting defamatory speech . . . long after law and equity courts had merged in most jurisdictions in the United States, stating that they had no authority to grant such relief."); Estella Gold, *Does Equity Still Lack Jurisdiction to Enjoin a Libel Or Slander?*, 48 Brook. L. Rev. 231, 239 (1982) (noting that "judicial reliance on this want of equity jurisdiction is technically inaccurate" in merged jurisdictions).

[68] *See, e.g.*, *Esskay Art Galleries v. Gibbs*, 172 S.W.2d 924, 927 (Ark. 1943) ("It is settled . . . that where no breach of trust or of contract appears, equity will not enjoin libelous or slanderous statements injurious to plaintiff's business, trade or profession . . . ."); *Moore v. City Dry Cleaners & Laundry*, 41 So. 2d 865, 873 (Fl. 1949) ("[A] court of equity will not enjoin the commission of a threatened libel or slander . . . An action at law will ordinary provide a full, adequate an[d] complete remedy in such cases . . . ."); *Montgomery Ward & Co. v. United Retail, Wholesale & Dep't Store Empls. of Am.*, 70 N.E.2d 75, 86 (Ill. 1946) ("[It] is the settled doctrine in this country that a court has no such power [*i.e.* to enjoin future libels.]"); *Kwass v. Kersey*, 81 S.E.2d 237, 247 (W. Va. 1947) ("[T]he cause of action, if any possessed by the plaintiff, was brought in the wrong forum and should have been instituted on the law side of the court."); *Kyritsis v. Vierson*, 382 S.W.2d 553, 559 (Tenn. Ct. App. 1964) ("In the instant case, we think complainant's remedy, if any, is by means of a suit of law."); *D'Ambrosio v. D'Ambrosio*, 610 S.E.2d 876, 886 (Va. Ct. App. 2005) ("Because Fowler has an adequate remedy at law [for a defamation claim], injunctive relief is inappropriate."); *see also Devine v. Devine*, 90 A.2d 126, 129 (N.J. Sup. Ct. Ch. Div. 1952); *Voltube Corp. v. B. & C. Insulation Prods.*, 89 A.2d 713, 716 (N.J. Sup. Ct. Ch. Div. 1951); *Weiss v. Levine*, 32 A.2d 574, 576 (N.J. Ch. 1943); *John R. Thompson Co. v. Delicatessen & Cafeteria Workers Union, Local 410*, 8 A.2d 130, 132 (N.J. Ch. 1939); *A. Hollander & Son v. Joseph Hollander, Inc.*, 177 A. 80, 82 (N.J. Ch. 1935); *Mayer v. Journeymen Stone-Cutters' Ass'n*, 20 A. 492, 495 (N.J. Ch. 1890).

defamation cases.[69] In 1931, the United States Supreme Court elevated the common law prohibition on prior restraints to a federal constitutional rule.[70] Although the decision held open the possibility of injunctive relief in an appropriate case, the United States Supreme Court "has never held that an injunction directed at defamatory speech is constitutional."[71] Today, a majority of the jurisdictions that refuse to enjoin future defamatory speech rely primarily on constitutional grounds.[72]

---

[69] *See, e.g.*, *Citizens' Light, Heat & Power Co. v. Montgomery Light & Water Power Co.*, 171 F. 553, 556 (C.C.M.D. Ala. 1909) ("The court cannot go outside of the [Alabama] Constitution, or hold that to be an inadequate remedy which the Constitution has declared to be the sole remedy."); *Montgomery Ward & Co. v. S.D. Retail Merchs.' & Hardware Dealers' Ass'n*, 150 F. 413, 418 (C.C.D.S.D. 1907) ("[A publisher] is entitled to invoke the constitutional guaranty contained in section 5, art. 6 of the Constitution of South Dakota . . . In the jurisprudence of the United States, there is no remedy for the abuse of this right conferred by the Constitution, except an action at law for damages or a criminal proceeding . . . ."); *Dailey v. Super. Ct. of S.F.*, 44 P. 458, 460 (Cal. 1896) ("We conclude that the order made by the trial court was an attempted restraint on free speech, as guarant[e]ed by the constitution of this state."); *State ex rel. Liversey v. Judge of Civil Dist. Ct.*, 34 La. Ann. 741, 746 (La. 1882) (finding an injunction prohibiting future defamatory speech of any kind "a direct violation of the [Louisiana] Constitution, *ultra vires*, and is absolutely null and void."); *Marlin Firearms Co. v. Shields*, 64 N.E. 163, 165 (N.Y. 1902) (noting that enjoining libels "would open the door for a judge sitting in equity to establish a censorship"); *Life Ass'n of Am. v. Boogher*, 3 Mo. App. 173, 180 (1876) ("It is obvious that, if this remedy be given on the ground of the insolvency of the defendant, the freedom to speak and write, which is secured, by the Constitution of Missouri, to all its citizens, will be . . . denied to one who has no property liable to an execution."); *Brandreth*, 8 Paige Ch. at 26 ("It is very evident that this court cannot assume jurisdiction of the case presented . . . without infringing upon the liberty of the press . . . .").

[70] *Near v. Minnesota ex rel Olson*, 283 U.S. 697, 712-13 (1931).

[71] *Freedom of Speech*, *supra*, at 39.

[72] *Id.* at 51. *See, e.g.*, *Metro. Opera Ass'n, Inc. v. Hotel Empls. & Rest. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001); *Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir.

Although the underlying rationale has evolved over time, the general rule continues to be that a court of equity will not issue an injunction against future defamatory speech. In courts where law and equity are separate, the rule is jurisdictional. In courts where law and equity have merged, the rule is prudential. Under both systems, the rule accords with constitutional doctrine. The upshot is the same: a court of equity generally cannot issue an injunction in a defamation case.[73]

---

1963); *Saad v. Am. Diabetes Ass'n*, 2015 WL 751295, at \*2 (D. Mass. Feb. 23, 2015); *Gunder's Auto Ctr. v. State Farm Ins.*, 617 F. Supp. 2d 1222, 1225 (M.D. Fla. 2009), *aff'd*, 442 F. App'x 819 (11th Cir. 2011); *Freedom Calls Found. v. Bukstel*, 2006 WL 845509, at \*22 (E.D.N.Y. Mar. 3, 2006); *Ameritech v. Voices for Choices, Inc.*, 2003 WL 21078026, at \*1-2 (N.D. Ill. May 12, 2003); *Tilton v. Capital Cities/ABC Inc.*, 827 F. Supp. 674, 682 (N.D. Okla. 1993); *Willing v. Mazzocone*, 393 A.2d 1155, 1158 (Pa. 1978); *Paradise Hills Assocs. v. Procel*, 1 Cal. Rptr. 2d 514, 518-19 (Ct. App. 1991); *Animal Rights Found. of Fl., Inc. v. Siegel*, 867 So. 2d 451, 456-57 (Fl. Dist. Ct. App. 2004).

[73] There is one decision from this court that appears at first blush to stand for a contrary proposition. In a 2015 opinion, this court denied a motion to dismiss a complaint that solely asserted a claim for defamation and sought a permanent and mandatory injunction requiring the defendant to "(1) remove all libelous articles and related hyperlinks from any of its websites; and (2) publish and promote a retraction of the articles." *Perlman v. Vox Media, Inc.*, 2015 WL 5724838, at \*8 (Del. Ch. Sept. 30, 2015). The defendants, however, only moved to dismiss for failure to state a claim upon which relief could be granted, so the decision did not have to reach the jurisdictional question. *Id.* at \*1. The default judgment that I entered in the *Simeon* Action also should not be read to suggest that jurisdiction existed on the face of the complaint in that action. Simeon initially moved to dismiss on jurisdictional grounds, then stopped participating in the litigation. No one briefed the jurisdictional issues that this decision has addressed, and I did not raise them *sua sponte*. Perhaps I should have thought to do so, but at the time, I was focused on the propriety of entering a default judgment in light of Dimitrov's on-again, off-again litigation tactics, which was the issue that the Company asked me to consider.

Judged under the general test for determining whether an adequate remedy exists at law, the Complaint's request for an injunction did not support equitable jurisdiction. Judged under the special rules that apply to requests for injunctions in defamation cases, that result is all the more clear.

### 3. Two Recent Exceptions to the Anti-Injunction Rule

Despite the broad rule against injunctive relief in defamation cases, courts in the twentieth century have carved out two exceptions. One is for business disputes. The other resurrected the previously rejected English practice of granting narrow injunctive relief after a final adjudication of falsity. Neither applies in this case.

### a. Trade Libel

During the twentieth century, American courts increasingly granted preliminary injunctions to address "trade libel," a concept that initially covered statements "disparaging the quality . . . of property," then expanded "to encompass any injury to economic advantage arising from false derogatory statements."[74] Courts divided on the

---

[74] Michael A. Albert & Robert L. Bocchino, Jr., *Trade Libel: Theory and Practice Under the Common Law, the Lanham Act, and the First Amendment*, 89 Trademark Rep. 826, 827 (1999); *accord* William L. Prosser, *Injurious Falsehood: The Basis of Liability*, 59 Colum. L. Rev. 425, 425-28 (1959) [hereinafter *Injurious Falsehood*]. As the tort expanded, the term "trade libel" became something of a misnomer, and commentators used other terms such as "disparagement or "injurious falsehood," with the latter term adopted by Prosser and the Second Restatement of Torts. *See* Restatement (Second) of Torts § 623A (Am. Law Inst. 1971); *Injurious Falsehood*, *supra*, at 425. Because many of the relevant decisions use the term "trade libel," this decision does as well.

availability of injunctive relief, with some judges issuing injunctions,[75] others adhering to the traditional anti-injunction rule,[76] and many adopting a middle ground in which a preliminary injunction would issue if the trade libel furthered another tort that independently warranted equitable relief.[77] The legitimacy of this type of injunction largely became moot after the passage of statutes like the Lanham Act[78] and state laws against deceptive trade practices,[79] which specifically authorized injunctive relief.[80]

---

[75] *See, e.g.*, *Black & Yates v. Mahogany Ass'n*, 129 F.2d 227 (3d. Cir. 1941); *Paramount Pictures, Inc. v. Leader Press, Inc.*, 106 F.2d 229 (10th Cir. 1939); *Saxon Motor Sales v. Torino*, 2 N.Y.S.2d 885 (Sup. Ct. 1938); *see Injurious Falsehood*, *supra*, at 428 ("These equity cases appear to complete the divorce from defamation, and to make it clear that the complex with which we are dealing is to be classified as one form of intentional interference with economic relations, and not as a branch of the special and strict liability for the more general harm to personal reputation involved in libel or slander.").

[76] *See John R. Thompson Co*, 8 A.2d at 132; *Joseph Hollander, Inc.*, 177 A. at 82.

[77] *See, e.g.*, *Maytag Co. v. Meadows Mfg. Co.*, 35 F.2d 403, 408 (7th Cir. 1929); *Keitel*, 209 F. at 357-58; *Edison*, 128 F. at 963; *Guion v. Terra Mktg. of Nev., Inc.*, 523 P.2d 847, 848 (Nev. 1974); *Davis v. New England Ry. Pub. Co.*, 89 N.E. 565 (Mass. 1909); *H.E. Allen Mfg. Co. v. Smith*, 224 A.D. 187, 192 (N.Y. App. Div. 1928); *Yood v. Daly*, 174 N.E. 779, 779 (Ohio Ct. App. 1930); *see also* Comment, *The Law of Commercial Disparagement, Business Defamation's Impotent Ally*, 63 Yale L.J. 65, 97-98 (1953) ("When disparagement occurs in combination with enjoinable competitive torts—notably appropriation of trade relations and interference with contract, courts will prohibit the whole course of unlawful conduct."); *Injurious Falsehood, supra*, at 428 (noting cases that have found injurious falsehoods "merely one method of unfair competition or of interference with business relations and so . . . grant the injunction").

[78] 15 U.S.C. § 1125.

[79] *E.g.*, 6 *Del. C.* § 2532.

[80] *See* 15 U.S.C. § 1116 ("The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable."); 6 *Del. C.* §

A decision from this court examined the propriety of an injunction for trade libel and joined the jurisdictions in the middle camp.[81] The case involved two competing businesses—Pitman & Sons, Inc. and Pitman Manufacturing Co.—that both manufactured and sold fryers. Pitman & Sons sued Pitman Manufacturing for expropriating its trade name, then sent a letter to its customers that included the following statements:

- "The famous 'Pitco Frialators' are manufactured exclusively by the J.C. Pitman & Sons, Inc. . . . Any association of the name Pitman with other than the 'Pitco Frialators' is an attempt to confuse the trade and introduce a copy of our 'Pitco Frialotor'. . . ."[82]

- "[Pitman Manufacturing] has started a campaign to confuse and deceive the trade; by unlawfully using the name Pitman; by unlawfully attempting to copy the genuine Pitman Fryer; by unlawfully producing the advertising matter of J.C. Pitman and Sons, Inc.; and by unlawfully attempting to force their inferior product on the trade in place of the genuine Pitco Frialator."[83]

- "It has become necessary to resort to court proceedings to stop this obvious deception; to stop the unlawful sale of this New Fryer; and to stop this new concern from capitalizing unlawfully on the good will honestly built up by J.C. Pitman and Sons . . . ."[84]

---

2533 ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and terms that the court considers reasonable.")

[81] *J.C. Pitman & Sons v. Pitman*, 47 A.2d 721 (Del. Ch. 1946)

[82] *Id.* at 723.

[83] *Id.*

[84] *Id.* at 724.

- "Any legitimate concern like yourself that buys or sells the products of this outfit might unwittingly become involved in this litigation—which would be very costly to you, and very regrettable to J.C. Pitman and Sons."[85]

- "We, therefore, advise you not to deal with this new corporation until its rights to manufacture and your right to buy or sell this questionable product is decided upon by the courts."[86]

Pitman Manufacturing brought a counterclaim alleging that the statements were defamatory and sought a preliminary injunction prohibiting further publication of the letters.

In ruling on the application for a preliminary injunction, the decision first summarized the existing authorities:

> Prior to . . . the Judicature Act of 1873, the English Court of Chancery would not enjoin the publication of a mere trade libel . . . But while the right to enjoin a trade libel is now established in that country, it will only be exercised in plain cases of irreparable injury. It is unnecessary to consider the peculiar statutory provisions involved, and whether there was any real enlargement of the inherent powers of equity.

> When no breach of trust or of contract rights appears, the American courts have almost uniformly followed the English rule prior to 1873, and have refused to enjoin mere trade libels. When, however, a court of equity has jurisdiction on some other ground, the American courts will also usually enjoin the continued publication of a trade libel incident thereto. That is true when the libel is accompanied by some act of unfair business competition, if irreparable damage is imminent . . . .[87]

Distilling a rule, the decision stated: "The necessary conclusion therefore is that a continued course of wrongful action may, ordinarily, be stopped by injunction, although

---

[85] *Id.*

[86] *Id.*

[87] *Id.* at 725 (citations omitted).

it includes a trade libel."[88] The court held that "[i]ntimidating possible customers by baseless threats to sue, should they deal with the complainant, comes within that rule."[89] The court therefore issued an injunction enjoining Pitman & Sons from sending out more letters. This instrumentalist approach to injunctive relief accorded with the middle approach that many other jurisdictions had endorsed.

Viewing the Complaint charitably, the Company might be seen as having attempted to plead a trade libel. Count III of the Complaint asserted a claim for tortious interference with prospective economic advantage. Unlike defamation, injunctive relief is a common and non-controversial remedy for tortious interference with prospective economic advantage.[90] Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech.[91]

---

[88] 47 A.2d at 726.

[89] *Id.*

[90] *See Copi of Del., Inc. v. Kelly*, 1996 WL 633302, at *4-5 (Del. Ch. Oct. 25, 1996) (granting injunctive relief); *Bowl-Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 62 (Del. Ch. 1972) (same), *aff'd*, 297 A.2d 67 (Del. 1972); *see also Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115 at *25 (Del. Ch. May 18, 2009) (considering but ultimately denying injunctive relief on equitable grounds), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

[91] *Injurious Falsehood*, *supra*, at 428; *see, e.g.*, *Carter v. Knapp Motor Co.*, 11 So. 2d 383, 385 (Ala. 1943); *Pure Milk Producers Ass'n v. Bridges*, 68 P.2d 658, 662 (Kan. 1937).

In this case, however, the Complaint's allegations failed to state a claim for tortious interference with prospective economic advantage.[92] To state such a claim, a plaintiff must plead "(a) the reasonable probability of a business opportunity, (b) the intentional interference by the defendant with that opportunity, (c) proximate causation, and (d) damages . . . ."[93] "[T]o plead a reasonable probability of a business opportunity, [a plaintiff] must identify a specific party who was prepared to entered into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm."[94] While the plaintiff does not need to identify a party by name, the plaintiff must do more than offer "vague statements about unknown

---

[92] A defendant "is entitled to contest the sufficiency of the complaint" even after defaulting. *Hauspie*, 945 A.2d at 587.

[93] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980); *accord* Restatement (Second) of Torts § 766B.

[94] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009) (Strine, V.C.) (internal quotations omitted).

customers."[95] A plaintiff cannot plead this element by alleging a "nebulous, unascertainable class" of business relationships.[96]

Here, the Complaint alleged only that Dimitrov interfered with "valuable prospective economic relationships and business opportunities with its bankers, customers, lenders, investors and prospective investors . . . ."[97] The Complaint provided no factual support for this conclusory allegation. The Complaint stated that the Company "believes it has lost potential investors," but provided no details.[98] The Complaint never specified any customer relationships that Dimitrov harmed. Vague allegations of this sort are insufficient.

There is also nothing in the Complaint to support a reasonable inference that Dimitrov intended to interfere with the Company's business relationships. There was no

---

[95] *Id.*; *accord Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1285 (Del. Super. 2001) (stating that a plaintiff must identify "specific prospective business relations"); *Wyschock v. Malekzadah*, 1992 WL 148002, at *3 (Del. Super. June 10, 1992) ("[T]he complaint fails to identify the parties and the subject matter of the business opportunity as to which there was a reasonable probability of fruition which ended because of defendant's alleged statements."); *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2178520, at *9 (Del. Ch. May 28, 2010) ("[T]he Counterclaims still do nothing more than imply the existence of a potential loan facility through an unnamed lender . . . Such allegations are insufficient to support a tortious interference with prospective contractual relations claim.").

[96] *Kimbleton v. White*, 2014 WL 4386760, at *8 (D. Del. Sept. 4, 2014).

[97] Compl. ¶ 53.

[98] *Id.* ¶ 25. During briefing on the Proposed Final Order, the Company only offered the single example of the $60 million investment from an investment bank and alleged in a wholly conclusory manner that Dimitrov was responsible for the Company losing that investment.

reason to believe that Dimitrov, who was unaffiliated with the Company, had any knowledge of the Company's ongoing discussions with potential investors. In fact, the Complaint ascribed a different intention to Dimitrov. "Defendant's acts in publishing the [Simeon Reports] and the [Simeon Tweets] were intended solely to drive down the price of Plaintiff's common stock, so that Defendant could effectuate profitable short sales of that stock."[99]

Count III thus failed to state a claim upon which relief can be granted. It therefore cannot provide a route to an injunction against defamatory statements that are part of a larger trade libel. It consequently cannot provide a basis for subject matter jurisdiction.

### b. Adjudicated Falsehoods

During the twentieth century, American courts also revisited the earlier resistance to granting injunctions in traditional defamation cases. Citing the growing willingness to consider injunctions in cases of trade libel, courts and commentators argued that the parity of reasoning called for injunctive relief for defamation in general.[100] Spurred by

---

[99] Compl. ¶ 27.

[100] *See, e.g.*, *Krebiozen Research Found. v. Beacon Press, Inc.*, 134 N.E.2d 1, 6 (Mass. 1956); *Murphy v. Daytona Beach Humane Soc., Inc.*, 176 So. 2d 922, 926-27 (Fl. Dist. Ct. App. 1965) (Wigginton, J., concurring); *Koussevitzky v. Allen, Towne & Heath*, 68 N.Y.S.2d 779, 785 (Sup. Ct. 1947); *Mazzocone v. Willing*, 369 A.2d 829, 831 (Pa. Sup. Ct. 1976), *rev'd*, 393 A.2d 1155 (Pa. 1978). *See generally* William A. Bertelsman, *Injunctions Against Speech and Writing: A Re-Evaluation*, 59 Ky. L.J. 319, 326 (1970) ("An injunction to protect business interests is no more or less a prior restraint on speech than an injunction to protect interests of personality."); Robert Allen Sedler, *Injunctive Relief and Personal Integrity*, 9 St. Louis U. L.J. 147, 154-55 (1964) [hereinafter *Personal Integrity*] ("The inhibiting effect on expression is analytically the same irrespective of the nature of the injury to the plaintiff.").

these insights, American courts began issuing permanent injunctions as part of a remedial package after speech had been judged defamatory. Five state Supreme Courts,[101] three United States Circuit Courts of Appeals,[102] and several lower courts[103] have endorsed permanently enjoining a defendant from repeating speech found defamatory in an adversarial proceeding. "[A]lthough the overall number of decisions granting injunctions is small relative to the total number of cases in which the plaintiffs requested injunctive relief, it is clear that a trend is emerging within both state and federal courts that permits injunctions if the speech in question was adjudged to be defamatory."[104]

---

[101] *Balboa Island Village Inn, Inc. v. Lemen*, 156 P.3d 339, 343 (Cal. 2007); *Retail Credit Co. v. Russell*, 218 S.E.2d 54, 62 (Ga. 1975); *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 309 (Ky. 2010); *Advanced Training Sys., Inc. v. Caswell Equip. Co.*, 352 N.W.2d 1, 11 (Minn. 1984); *O'Brien v. Univ. Cmty. Tenants Union, Inc.*, 327 N.E.2d 753, 754 (Ohio 1975); *see also Sid Dillon*, 559 N.W.2d at 746 (expressing support for this approach in dicta).

[102] *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1238 (9th Cir. 1997); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992); *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208-09 (6th Cir. 1990) (Wellford, J., concurring in part and dissenting in part).

[103] *See, e.g.*, *Baker v. Kuritzky*, 95 F. Supp. 3d 52, 59 (D. Mass. 2015); *ThermoLife Int'l LLC v. Connors*, 2014 WL 1050789, at *7 (D.N.J. Mar. 17, 2014); *Wagner Equip. Co v. Wood*, 893 F. Supp. 2d 1157, 1163 (D.N.M. 2012); *Saadi v. Maroun*, 2009 WL 3617788, at *3 (M.D. Fla. Nov. 2, 2009); *Lassiter v. Lassiter*, 456 F.2d 876, 884 (E.D. Ky. 2006); *Rooks v. Krzewski*, 2014 WL 1351353, at *31 (Mich. Ct. App. Apr. 3, 2014); *Chambers v. Scutieri*, 2013 WL 1337935, at *14 (N.J. Super. Ct. App. Div. Apr. 4, 2013).

[104] *Freedom of Speech*, *supra*, at 51. The trend has not escaped criticism, whether via dissent or commentary. *See, e.g.*, *Metro Opera Ass'n*, 239 F.3d at 178 ("We have never held in this Circuit that a libel becomes subject to an injunction once its libelous character has been adjudicated."); *Kramer v. Thompson*, 947 F.2d 666, 677 (3d Cir. 1991) ("[T]he maxim that equity will not enjoin a libel has enjoyed nearly two centuries

In my view, the potential availability of permanent injunctive relief following an adjudication of falsity that is narrowly tailored to the scope of the adjudication cannot reach back to support equitable jurisdiction.[105] Determining whether equitable jurisdiction exists at the outset of a case has different implications than awarding an equitable remedy at its conclusion. Most significantly, analyzing the former issue results in a judge making a preliminary determination about the viability of the defamation claim on an incomplete, pleading-stage record. Such an approach contravenes both the longstanding public policy against judges censoring speech and the equally longstanding preference for juries addressing defamation claims.[106] One of the principal arguments in

---

of widespread acceptance at common law. The welter of academic and judicial criticism of the last seventy years has, in truth, done little more than chip away at its edges."); *Kinney v. Barnes*, 443 S.W.3d 87, 99 (Tex. 2014) ("[W]e hold that the Texas Constitution does not permit injunctions against future speech following an adjudication of defamation."); Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157, 173 (2007) (criticizing the modern trend and arguing that "[t]he [United States] Supreme Court and lower courts . . . should reaffirm the longstanding rule that equity will not enjoin defamation and that such injunctions are prior restraints that inherently violate the First Amendment.").

[105] To the court's knowledge, no Delaware case has considered whether a court may enjoin future defamatory speech following an adjudication of falsity. This decision expresses no view on the issue. Nor should the permanent injunction that the court entered in the *Simeon* Action be interpreted as endorsing the availability of injunctive relief for defamation under Delaware law. The court entered final judgment in the form requested by the Company without considering the legal issues discussed in this opinion. As the Company acknowledged in its briefing on the Proposed Final Order, the breadth of the injunctive relief granted in the *Simeon* Action is constitutionally suspect at best. Dkt. 20 at 53-56; *see Freedom of Speech*, *supra*, at 53-54.

[106] *See Kramer*, 947 F.2d at 677 (noting the "almost talismanic significance that the case law attaches to the decisions of juries" in defamation cases); *Kidd*, 28 F. at 776 ("Charges of slander are peculiarly adapted to and require trial by jury."); *Hazy v. Woitke*,

favor of permitting a post-trial award of permanent injunctive relief has been that it does not violate these policies.[107] Delaware law echoes the strong preference for jury determinations of defamation claims.[108]

Unlike in a jurisdiction where law and equity have merged, there is another court that can capably adjudicate the claim. "Equity and law courts should not be placed in the

---

48 P. 1048, 1049-50 (Colo. 1897); ("[T]he prosecutor or plaintiff must . . . satisfy a jury that the words are such, and so published, as to convey the libelous imputation."); *Heller v. Pulitzer Publ'g Co.*, 54 S.W. 457, 459 (Mo. 1899) ("But while a court may sustain a demurrer . . . it cannot direct a verdict for the plaintiff in a libel case. In this respect libel cases differ from other cases."); *Clarifying Lens*, *supra*, at 704 ("[T]he continuation throughout the nineteenth century of the Revolutionary era understanding that it was impossible for a defamation defendant to be found liable without a jury verdict against him stands as an exception to the general trend toward greater judicial control of juries."). *See generally Injuries to Personality*, *supra*, at 656 ("There is a clear policy in favor of jury trial of an issue of truth in a charge of defamation. Juries are peculiarly adapted to try such an issue . . . .").

[107] *See Kramer*, 947 F.2d at 675-77; *Balboa*, 156 P.3d at 350-51; *Sid Dillon*, 559 N.W.2d at 746; *Caswell*, 352 N.W.2d at 11. *See generally Clarifying Lens*, *supra*, at 735 ("The presence or absence of a jury was central to the considerations the sensibly distinguished the impermissible regime of prior restraints from the permissible regime of subsequent punishment."); *Personal Integrity*, *supra*, at 154 ("Since we are no longer concerned with questions of 'equity jurisdiction' the fact that the plaintiff seeks injunctive relief would not prevent the court's [sic] summoning a jury in a proper case.")

[108] *See* Del. Const. art. I, § 5 (providing that "in all indictments for libels the jury may determine the facts and the law, as in other cases"); *Kanaga*, 750 A.2d at 1181 (holding that "the issue of whether the media defendants deviated from a journalistic standard of care was well within the grasp of a jury" and did not require expert testimony); *Nichols v. Lewis*, 2007 WL 1584622, *1 (Del. Ch. May, 24, 2007) (Strine, V.C.) (transferring trade libel claims to Superior Court following dismissal of other claims; concluding that although jurisdiction existed under the clean-up doctrine, transfer was preferable and "the defendants' desire to have a jury trial if the case proceeds that far is one that I should give substantial weight, particularly in the context of a defamation claim").

position of competing for litigation nor should [a] [p]laintiff be afforded a choice of forums."[109] The Superior Court has been the primary forum for adjudicating defamation claims. That court's ample experience provides an additional reason for this court to decline jurisdiction.[110] To the extent a case warrants an equitable remedy, a plaintiff has procedural avenues available. On the request of a party or *sua sponte*, the Superior Court may transfer a case to this court at the remedial phase to consider injunctive relief.[111] Or the Chief Justice can designate the Superior Court judge to serve as a vice chancellor *pro hac vice*.[112]

---

[109] *Johnson v. Penrose, Inc.*, 1983 WL 19789, at *2 (Del. Ch. Apr. 21, 1983); *accord Flinn*, 118 U.S. at 389 ("If a court of equity could interfere and use its remedy of injunction in [defamation] cases, it would draw to itself the greater part of the litigation properly belonging to the courts of law.").

[110] *See Gelof*, 2010 WL 759663, at *3 ("Gelof's claims should be heard in Superior Court, which is the Court with jurisdiction, and, as a result, has substantial experience in adjudicating professional negligence claims such as this.").

[111] *See* 10 *Del. C.* § 1902; *Mass. Mut. Life Ins. v. Certain Underwriters at Lloyd's of London*, 2010 WL 3724745, at *4 (Del. Ch. Sep. 24, 2010); *see, e.g.*, *Draper v. Westwood Dev. P'rs, LLC*, 2010 WL 2432896, at *5 (Del. Ch. June 3, 2010) (transferring case back to Superior Court, where it was originally filed).

[112] Del. Const. art. IV § 13(2); *Employers Ins. Co. of Wausau v. Pinkerton's Inc.*, 2004 WL 1195369, at *1 (Del. Super. May 11, 2004) ("Subsequent to transfer . . . to the Court of Chancery, either party may petition for, or either court may sua sponte initiate, proceedings to consolidate the cases before one Judge or Chancellor in accordance with Article IV, Section 13(2) of the Delaware Constitution of 1897."). *See, e.g.*, *Caldera Properties-Lewes/Rehoboth VII, LLC v. Ridings Dev., LLC*, 2009 WL 2231716 (Del. Super. May 29, 2009) (Judge Graves presiding over consolidated case as both Superior Court Judge and Vice Chancellor by designation); *Reybold Venture Gp. XI-A, LLC v. Atl. Meridian Crossing, LLC*, 2009 WL 143107, at *6 n.44 (Del. Super. Jan. 20, 2009) (dismissing case for lack of subject matter jurisdiction but recommending appointment as Vice Chancellor by designation); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1989 WL

Because Delaware has maintained its separate courts of law and equity, the potential availability of permanent injunctive relief following an adjudication of falsity did not provide grounds for filing this case in this court. This case belonged in the Superior Court.

## B.    Disgorgement

The other equitable remedy that the Company cites is disgorgement. As a threshold matter, the Complaint did not ask for this form of relief. "Equitable jurisdiction must be determined from the face of the complaint at the time of filing."[113] The Company therefore cannot rely on disgorgement to ground jurisdiction in this court.

Disgorgement only entered the picture eight months after the Complaint was filed. During the damages hearing, I balked at the Company's request for a prodigious award that seemed disproportionate to the harm it had suffered. I mentioned that disgorgement of Dimitrov's trading profits might be a more fitting measure. Candidly, I had not considered when making this comment whether a disgorgement remedy comported with formal doctrine. My thought instead was that it provided a good starting point for measuring proportionality.

___

997183, at *3 (Del. Super. Sept. 29, 1989) (defendant moved to dismiss or transfer in favor of parallel litigation in Court of Chancery; Judge Martin denied the motion after being designated to sit in Chancery by designation); *New Castle Cty. v. Christiana Town Ctr., LLC*, 2004 WL 1835103 (Del. Ch. Aug. 16, 2004) (Judge Gebelein sitting as Vice Chancellor by designation); *Interim Healthcare, Inc. v. Spherion Corp.*, 2003 WL 22902879 (Del. Ch. Nov. 19, 2003) (then-Judge Slights sitting as Vice Chancellor by designation).

[113] *Comdisco*, 602 A.2d at 78.

After reviewing pertinent authority, the remedy of disgorgement appears sufficiently disconnected from the tort of defamation that that a request for disgorgement would not have supported equitable jurisdiction. "Remedies for libel and slander are traditionally damages remedies. Restitutionary remedies have not been applied to defamation cases . . . ."[114] While theoretically a plaintiff might seek disgorgement or another restitutionary remedy as an alternative to damages,[115] the handful of cases to consider the issue have rejected these requests.[116]

Traditional disgorgement also does not make sense in this case because Dimitrov's trading profits did not come at the Company's pecuniary expense. A New York trial court recently addressed this issue in a similar context.[117] The plaintiff alleged that the defendant "published defamatory letters and internet postings against it as part of a

---

[114] *Law of Remedies*, *supra*, at 265.

[115] *Id.* at 296; *see also* Kenneth H. York, *The Extension of Restitutional Remedies in the Tort Field*, 4 UCLA L. Rev. 499, 539-46 (1957). One scholar has noted that "there has been little real interest among lawyers" in extending restitutionary remedies to defamation plaintiffs, "perhaps because plaintiffs are much better off with the vague general or presumed damages and the unmeasurable emotional distress damages." *Law of Remedies*, *supra*, at 297.

[116] *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016) ("Neither the district court nor Ventura cited any case awarding profits in a defamation case under an unjust enrichment theory . . . We find none."); *Hart v. E.P. Dutton & Co.*, 197 Misc. 274, 282 (N.Y. Sup. 1949), *aff'd*, 277 A.D. 935 (N.Y. App. 1950) (denying action in assumpsit for publishers' profits from selling a defamatory book and holding that "[a]n action for damages affords the plaintiff full compensation for any injuries which he had suffered."); *see* Dobbs, *supra*, at 296.

[117] *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 959 N.Y.S.2d 92, 2012 WL 3569952 (Sup. Ct. Aug. 12, 2012).

scheme to drive Silvercorp's stock prices down in order to profit from their short sale position."[118] Silvercorp asserted claims for both defamation and unjust enrichment. The court dismissed both claims but stressed that even if Silvercorp had stated a claim for defamation, its claim for unjust enrichment would fail. "Silvercorp cannot allege that defendants have been unjustly enriched at Silvercorp's expense, since Silvercorp did not make any payments or financially contribute to the profits defendants received. The profits defendants received simply did not come from Silvercorp, but from the shares bought and sold on the stock exchange."[119] The same is true here. Dimitrov's trading profits came at the expense of other traders on the open market. While the Company was harmed as a result of Dimitrov's defamatory comments, it was not harmed as a result of Dimitrov's profitable trades.

It still seems to me that when sizing a damages award, a court might well consider the vast difference between the magnitude of Dimitrov's trading profits and the size of the Company's damages request. From a doctrinal standpoint, however, disgorgement was not available as a remedy for defamation and does not provide a basis for this court to exercise equitable jurisdiction.

### III. CONCLUSION

Neither of the equitable remedies that the Company has cited support the existence of jurisdiction in this court. There are no other grounds for equitable jurisdiction. This

---

[118] *Id.* at *1.

[119] *Id.* at *12 (citation omitted).

court therefore lacked subject matter jurisdiction over the Complaint. The motion to vacate the default judgment is granted. The case is dismissed for lack of jurisdiction, subject to the Company electing to have the matter transferred to the Superior Court.[120]

---

[120] *See* 10 *Del. C.* § 1902.