# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STEPHEN G. PERLMAN, REARDEN LLC, and ARTEMIS NETWORKS LLC,

            Plaintiffs,

v.

VOX MEDIA, INC.,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**C.A. No. 10046-VCS**

## MEMORANDUM OPINION

Date Submitted: April 17, 2019
Date Decided: June 27, 2019

Matthew E. Fischer, Esquire, Jacob R. Kirkham, Esquire and Jacqueline A. Rogers, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Peter L. Frattarelli, Esquire of Archer & Greiner, P.C., Wilmington, Delaware and James Rosenfeld, Esquire and Jeremy A. Chase, Esquire of Davis Wright Tremaine LLP, New York, New York, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

The dispositive question presented by Defendant, Vox Media, Inc., in its motion for summary judgment reduces to this: can a plaintiff invoke this court's limited subject matter jurisdiction in connection with a claim for defamation by seeking a mandatory injunction to compel the defendant to remove the allegedly defamatory statement from an online publication? In my view, the answer to that question is no.

Plaintiffs, Stephen G. Perlman, and his companies, Rearden LLC ("Rearden") and Artemis Networks LLC ("Artemis"), filed their Verified Second Amended Complaint (the "Complaint") against Vox on December 24, 2014,[1] in which they assert claims for defamation arising from two allegedly defamatory statements made in separate articles posted in Vox's online publication known as *The Verge*. Specifically, Plaintiffs seek a final judgment: (1) declaring the articles contain defamatory statements about Plaintiffs; (2) compelling Vox to remove all defamatory statements about Plaintiffs from its websites and related social media accounts; (3) compelling Vox to publish a retraction of the allegedly defamatory articles at the Uniform Resource Locator ("URL" or web address) of each article and

---

[1] Plaintiffs' initial Complaint and Verified First Amended Complaint, filed August 18, 2014 and September 24, 2014, respectively, asserted claims against both Vox Media, Inc. and Vox Media Partner LLC, but Plaintiffs' Verified Second Amended Complaint, filed December 24, 2014, asserts claims only against Vox Media, Inc.

on *The Verge*'s main page;[2] and (4) awarding compensatory damages in an amount to be determined at trial.

In this Memorandum Opinion, following this court's scholarly and thoughtful Opinion in *Organovo Hldgs., Inc. v. Dimitrov*, I conclude that, in connection with a claim for defamation, the Court of Chancery, in all instances, lacks subject matter jurisdiction to adjudicate the questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice.[3] A defendant alleged to have committed the tort of defamation is entitled, should she wish, to have a jury decide those threshold questions. If the jury declares that the defendant is liable for defamation, then the plaintiff may seek to enforce that declaration of defamation with mandatory injunctive relief in Chancery, but only in the event the declaration is not enough to prompt the defendant to remove the defamatory content from the offending site.[4] Because this Court lacks subject matter jurisdiction to adjudicate the factual questions implicated by Plaintiffs' claims for defamation, Defendant's motion for summary judgment must be granted.

---

[2] Given the time that has elapsed since the articles were published, Plaintiffs no longer seek to compel Vox to publish a retraction. Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. 27 n.84.

[3] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017) (Laster, V.C.).

[4] *Id.* at 124 ("[T]he potential availability of permanent injunctive relief following an adjudication of falsity that is narrowly tailored to the scope of the adjudication cannot reach back to support equitable jurisdiction.").

# I. FACTUAL BACKGROUND

For purposes of this Memorandum Opinion, I have focused on the facts relevant to the subject matter jurisdiction issue.[5] I have drawn the facts from the admissions in the pleadings, uncontested facts presented in the parties' submissions and those matters of which the Court may take judicial notice.[6] I have resolved any doubt as to the absence of a genuine issue of fact in favor of Plaintiffs as the non-moving parties.[7]

## A. The Parties

Plaintiff, Stephen Perlman, is an entrepreneur and founder of technology companies including Plaintiffs, Rearden and Artemis.[8] Perlman serves as President

---

[5] The Court provided an extensive discussion of the factual background of this dispute in its decision on Defendant's motion to dismiss. *Perlman v. Vox Media, Inc.*, 2015 WL 5724838 (Del. Ch. Sept. 30, 2015). Vox did not raise subject matter jurisdiction as a defense at that time, presumably because *Organovo* had not yet been decided. While it is unfortunate the jurisdictional question has been raised so late in this litigation, I note that the question of whether Chancery has subject matter jurisdiction over an action cannot be waived and may be raised by the parties or the Court at any time. *See* Ct. Ch. R. 12(b)(3); *IBM Corp. v. Comdisco, Inc.*, 602 A.2d 74, 77 n.5 (Del. Ch. 1991) ("[U]nlike many jurisdictions, judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties.").

[6] *See* Ct. Ch. R. 56(c). Citations to the Verified Second Amended Compl. will be to "SAC ¶ __." and to the Def.'s Answer to Pls.' Verified SAC will be to "Answer ¶ __."

[7] *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979).

[8] SAC ¶¶ 12–14; Answer ¶ 12.

and Chief Executive Officer of both companies.[9] Plaintiff, Artemis, is wholly owned by Rearden; Plaintiff, Reardon, is wholly owned by Perlman.[10]

Defendant, Vox, a Delaware corporation, owns and operates *The Verge*, an online publication that covers the intersection of technology, science, culture and transportation. Vox also owns the online publications *Polygon*, *Vox* and *SB Nation*.[11]

### B. OnLive, Inc.

In 2003, Perlman founded non-party, OnLive, Inc., which operated a video game streaming service by the same name ("OnLive Service").[12] After several efforts to raise capital for OnLive Service failed,[13] OnLive, Inc. was forced to enter into an Assignment for the Benefit of Creditors ("ABC"), under which it transferred its assets and OnLive Service to OL2, Inc. ("OL2"), an entity operated by technology investor Gary Lauder.[14] Following the ABC, in late August 2012, OnLive, Inc. had

---

[9] Answer ¶ 12.

[10] *Id.* ¶¶ 3–14.

[11] SAC ¶ 15.

[12] *Id.* ¶ 16; Answer ¶¶ 16–18; Transmittal Aff. of Jacob R. Kirkham in Support of Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. ("Kirkham Aff.") Ex. 1; Transmittal Aff. of Peter L. Frattarelli in Supp. of Def. Vox Media, Inc.'s Mot. for Summ. J. ("Frattarelli Aff.") Ex. 17 ("Perlman Dep.") 28:19–29:11.

[13] Perlman Dep. 38:1–11, 39:15–19, 40:6–7, 41:15–18; Kirkham Aff. Ex. 2.

[14] Perlman Dep. 65:24–66:6.

"no assets or operations," "no officers or employees . . . [and] no records."[15] In connection with the ABC, Russell Burbank was hired as OnLive, Inc.'s board director, manager and liquidating agent through at least April 21, 2015.[16] He managed the company's business dealings[17] and supervised the "wind[ing] up of the company, [including eventually] . . . dissolv[ing] it."[18]

After years of inactivity, in April 2015, OnLive Service finally ceased operations altogether when OL2 sold its patents to Sony.[19] OnLive announced, "[a]fter April 30, 2015, our data centers will shut down and the service will be

---

[15] Frattarelli Aff. Ex. 23 at 1 & Ex. 26 at 1. The company did not revamp operations, buy assets, earn revenues, hire employees, hold board meetings or pay franchise taxes. *See* Frattarelli Aff. Ex. 10 Interrogatory Responses ("Interrogatory Resp.") 11–13; Frattarelli Aff. Ex. 18 ("Burbank Dep.") 12:17–14:7, 16:2–16, 36:4–22, 55:9–17; Frattarelli Aff. Ex. 27. OnLive, Inc. was effectively "defunct." *See* Frattarelli Aff. Ex. 28 at 1; Burbank Dep. at 73:1–14.

[16] Burbank Dep. 88:6–16.

[17] Interrogatory Resp. No. 11; Perlman Dep. 56:1–77:3.

[18] Burbank Dep. 16:17–20, 29:21–30:13; Frattarelli Aff. Ex. 23 at 1–2.

[19] *Perlman*, 2015 WL 5724838, at *35–36; Frattarelli Aff. Ex. 16 ("Anderson Dep.") 142:24–25; Burbank Dep. 88:2–89:5. *See* Frattarelli Aff. Ex. 29 ("Amid financial turmoil, OnLive—as we knew it—folded in 2012, and Perlman left. Since then, OnLive has been under the radar, to say the least."); Frattarelli Aff. Ex. 31 (OnLive "didn't exactly disappear, but it did go incredibly quiet").

offline. All accounts will be closed, and all data deleted . . . ."[20] Until at least March 1, 2014, OnLive, Inc. remained a Delaware corporation.[21]

## C. The 2012 Articles

On August 19, 2012, *The Verge* published an article by Tracey Lien titled "OnLive's bankruptcy protection filing leaves former employees in the dark" ("August 19 Article").[22] That same day, Jane Anderson, who was responsible for OnLive, Inc.'s communications and public relations, contacted individuals at *The Verge*, including Sean Hollister, to alert them of what she believed to be inaccuracies in the article.[23] After investigating Anderson's concerns, *The Verge* directed Hollister to write a corrected version of the August 19 Article.[24] *The Verge* removed the original version of the August 19 Article and published the corrected version.[25] The content of the original article, however, remained available online.[26]

---

[20] Frattarelli Aff. Ex. 32.

[21] Kirkham Aff. Ex. 1.

[22] Frattarelli Aff. Ex. 1 Aff. of Nalay Patel in Supp. of Def.'s Mot. for Summ. J. ("Patel Aff.") ¶¶ 1, 3, 4. The "bankruptcy protection" referred to in the article apparently was a reference to the ABC filing.

[23] *See* Anderson Dep. 46:12–47:25; Frattarelli Aff. Ex. 2 Aff. of Sean Hollister in Supp. of Def.'s Mot. for Summ. J. ("Hollister Aff.") ¶ 3.

[24] *See* Hollister Aff. ¶ 3; Anderson Dep. at 51:8–17, 49:1–24.

[25] Hollister Aff. ¶ 3; Frattarelli Ex. 3 (Corrected August 19 Article).

[26] *See, e.g.*, Kirkham Exs. 8–12.

On August 28, 2012, *The Verge* published an article by Hollister titled "OnLive lost: how the paradise of streaming games was undone by one man's ego" ("August 28 Article" and, together with the August 19 Article, the "2012 Articles").[27] Hollister emailed the final draft of the August 28 Article to Anderson and notified her that he intended to publish.[28] Anderson tried to reach Hollister by phone and email to fact check the August 28 Article before it was posted.[29] They did not connect, however, and the article was published as written by Hollister.[30]

---

[27] Patel Aff. ¶ 5; Certification of Peter L. Frattarelli in Supp. of Def.'s Mot. For Summ. J. ("Frattarelli Cert.") ¶¶ 4–5; Frattarelli Cert., Ex. 4 (August 28 Article).

[28] Hollister's email stated:

> Hey! Just wanted to give you a heads up that [Vox is] going to be running with a report that I don't think you'll like very much . . . I originally wanted to reach out to you and go through a process and maybe get some of [Perlman's] perspective (which I'd still like, honestly!) but the team decided I'd done enough interviewing already and that the story was getting away from me. I just don't want you to read this and have an aneurysm or anything! You're far too nice for that! –Sean

Frattarelli Ex. 14.

[29] *Id.*

[30] Perlman Dep. 183:24–25, 140:18–141:5; Anderson Dep. 72:25–74:18; Hollister Aff. ¶¶ 5–7, Ex. A.

When Perlman read the August 28 Article, he believed it was a "complete fiction."[31] He was "concerned [the article] would harm Reardon's business reputation and his own personal and business reputation.[32]

## D. The 2014 Article

On February 19, 2014, *The Verge* published an article titled "The man behind OnLive has a plan to fix your terrible cellphone service," by Aaron Souppouris ("2014 Article").[33] The 2014 Article opened, "Steve Perlman, the creator of the defunct game-streaming service OnLive, claims he has the answer to slow wireless service."[34] The words "defunct game-streaming service OnLive" hyperlinked to the August 28 Article, allegedly for background information.[35] The 2014 Article went on to discuss a new wireless antenna developed by Perlman and Artemis called "pCell."[36] According to Plaintiffs, the reference to OnLive as "defunct," the link to the defamatory August 28 Article and certain criticisms of the pCell technology render the 2019 Article defamatory.

---

[31] Perlman Dep. 120:5–12.

[32] *Id.* 122:14–21; *see* Anderson Dep. 72:18–24.

[33] Frattarelli Ex. 5.

[34] *Id.*

[35] Patel Aff. ¶¶ 7–9; Frattarelli Ex. 5.

[36] *See* Frattarelli Ex. 5.

### E. Procedural Posture

On August 18, 2014, Plaintiffs filed their initial Verified Complaint asserting that Vox made false statements about Plaintiffs in articles published from August 19, 2012 through February 19, 2014, and that the false statements continue to cause irreparable harm to Plaintiffs' reputations.[37] They sought damages and mandatory injunctive relief.[38] On September 24, 2014, Plaintiffs filed their Verified First Amended Complaint.[39] Vox responded with its motion to dismiss the Verified First Amended Complaint.[40]

On December 24, 2014, Plaintiffs filed their Verified Second Amended Complaint.[41] On January 15, 2015, Vox moved to dismiss that Complaint, arguing Plaintiffs' claims were untimely as to the 2012 Articles and otherwise failed because the 2014 Article was substantially true and did not republish the 2012 Articles.[42] Vice Chancellor Parsons denied the motion to dismiss on September 30, 2015.[43]

---

[37] D.I. 1.

[38] *Id.*

[39] D.I. 4.

[40] D.I. 6.

[41] D.I. 11.

[42] D.I. 12.

[43] D.I. 22.

On October 28, 2015, Vox filed its Answer to the Plaintiffs' Verified Second Amended Complaint in which it raised twenty affirmative defenses, including that the Court lacked subject matter jurisdiction.[44] On October 12, 2017, the Court granted a stipulation and order governing the case schedule whereby the parties agreed to bifurcate fact discovery to allow Vox to move for summary judgment on its affirmative defenses.[45] On September 28, 2018, Vox filed its motion for summary judgment,[46] and the Court heard oral argument on that motion on March 21, 2019.[47]

## II. LEGAL ANALYSIS

The Court of Chancery is proudly a court of limited jurisdiction. Its judges will adjudicate claims only when (1) the complaint states a claim for relief that is equitable in character, (2) the complaint requests an equitable remedy when there is no adequate remedy at law or (3) Chancery is vested with jurisdiction by statute.[48] In addition to these settled bases for subject matter jurisdiction, to avoid piecemeal litigation, the so-called "clean-up doctrine" allows Chancery to exercise subject

---

[44] D.I. 23.

[45] D.I. 40.

[46] D.I. 71.

[47] D.I. 125.

[48] *See Candlewood*, 859 A.2d at 997; 10 *Del. C.* §§ 341, 342. *See also, e.g.*, 8 *Del. C.* § 111.

jurisdiction over a claim at law if the plaintiff has stated a *bona fide* claim over which

Chancery had original subject matter jurisdiction.[49]

As well and thoroughly explained in *Organovo*, courts adhering to a common

law tradition historically have reserved determinations of falsity and malice for the

collective wisdom of a jury rather than cast a judge as the sole arbiter of defamation

and libel.[50] With this and other considerations in mind, Vice Chancellor Laster

concluded in *Organovo* that the plaintiff's defamation claim should be dismissed for

want of subject matter jurisdiction.[51] He then allowed the plaintiff to elect to transfer

its case to the Superior Court.[52]

---

[49] *See generally Kraft v. Wisdom Trees Invs., Inc.*, 145 A.3d 969, 975 (Del. Ch. 2016).

[50] *See Organovo*, 162 A.3d at 114–19 (citing, among other authority, Michael I. Meyerson, *The Neglected History of the Prior Restraint Doctrine: Rediscovering the Link Between the First Amendment and the Separation of Powers*, 34 Ind. L. Rev. 295, 306 (2001) (observing that "one of the major Eighteenth Century battles for freedom of the press was to give jurors, rather than judges, the power to determine whether publications were in fact defamatory."); *Kidd v. Horry*, 28 F. 773, 776 (C.C.E.D. Pa. 1886) ("Charges of slander are peculiarly adapted to and require trial by jury."); *Am. Malting Co. v. Keitel*, 209 F. 351, 356 (2d Cir. 1913) ("In a country which has constitutional guarantees of freedom of speech and of the press and of trial by jury, courts of equity should be slow to assume that they possess a power to deal with the publication of libels that the High Court of Chancery in England disclaimed.")).

[51] *Organovo*, 162 A.3d at 125 (noting that "[e]quity and law courts should not be placed in the position of competing for litigation nor should [a] [p]laintiff be afforded a choice of forums.").

[52] *Id.* at 127 (invoking 10 *Del. C.* § 1902). *Accord, Nichols v. Lewis*, 2007 WL 1584622, at *1 (Del. Ch. May 24, 2007) (Strine, V.C.) (transferring trade libel claims to Superior Court following dismissal of other claims).

Plaintiffs would have me either depart from *Organovo* or distinguish the decision on the ground that Vice Chancellor Laster was addressing a prayer for injunctive relief with respect to future defamatory statements whereas Plaintiffs here seek an injunction to require Vox to remove defamatory statements already made from the websites where the statements are now posted. In this regard, Plaintiffs maintain that *Organovo* simply applied the "traditional maxim that 'equity will not enjoin a libel.'"[53]

Plaintiffs are correct; *Organovo* did address a plaintiff's request that the court restrain future libelous statements. But that posture did not animate or alter the court's thorough discussion of defamation as a claim uniquely suited for adjudication by a law court, and specifically, if either party demands, by a jury. That holds true even where the plaintiff may ultimately seek equity's intervention to compel a defendant found liable of defamation to take down a defamatory statement from a post that remains available for consumption on the internet.[54]

---

[53] 2 Rodney A. Smolla, *Law of Defamation* § 9.85 (2d ed. 2012); *see also* 2 ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS § 10.6.1 (4ᵗʰ ed. 2010) ("One principle long adhered to in defamation cases is that courts will not enjoin libels."); David S. Ardia, *Freedom of Speech, Defamation, and Injunctions*, 55 William & Mary L. Rev. 1, 18 (2013) ("The no-injunction rule has been a fixture of Anglo-American law for more than three centuries."); *Capstack Nashville 3 LLC v. MacVenture P'rs*, 2018 WL 3949274, at *6 (Del. Ch. Aug. 16, 2018) (holding that "the rule against speech restraints" prohibited the entry of a temporary restraining order to prevent future alleged "trade libel").

[54] *See Organovo*, 163 A.3d at 124 (holding that "*the potential availability of permanent injunctive relief following an adjudication of falsity* that is narrowly tailored to the scope

Moreover, "[d]amages are [the] standard remedy for defamation."[55]  Indeed, the crux of what Plaintiffs seek here are damages caused by Vox's conduct "in an amount to be determined at trial."[56]  Although Plaintiffs try to dress their allegations of "lost business opportunities and lost investments" as irreparable harm, those losses, if proven, are readily and historically compensable by damages.[57]  If it is determined that Plaintiffs require an injunction after a jury has adjudicated their

Remainder of page intentionally left blank

---

of the adjudication *cannot reach back to support equitable jurisdiction*") (emphasis supplied).

[55] *Organovo,* 162 A.3d at 114.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 23 (1990) ("[I]mperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.").

[56] SAC ¶ 11.

[57] *Id.* ¶¶ 108–10 (alleging Artemis lost $100 million investments in 2014).  *See Danias v. Fakis*, 261 A.2d 529, 531–32 (Del. Super. 1969) (observing that harm in a defamation action is "capable of being measured in money with approximate exactness"); ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS § 10.5.1 (4th ed. 2010) ("Where the plaintiff loses money as a result of the defamation, that loss, when proved, can of course be the basis for a [damages] award.").

defamation claims,[58] then the case can be transferred to Chancery[59] or, if deemed appropriate, the assigned Superior Court judge can be designated as a Vice Chancellor to provide the suitable equitable remedy.[60]

---

[58] I note that the need for later injunctive relief is unlikely given that Plaintiffs seek a declaratory judgment that the offending statements are defamatory. If Plaintiffs secure that declaration, and thereafter demand that Vox take down the defamatory statements, it would be foolish and wasteful for Vox to decline that request and thereby require Plaintiffs to initiate further litigation to compel that result. I note separately that Vox has raised laches, a uniquely equitable defense, as an affirmative defense to Plaintiffs' defamation claim, a claim unique to the common law. Should Plaintiffs elect to transfer their claims to the Superior Court, the timeliness of the defamation claim can be tested under traditional statute of limitations analyses. This is yet another reason why the Superior Court should be adjudicating these claims.

[59] *See* 10 *Del. C.* § 1902; *see, e.g.*, *Draper v. Westwood Dev. P'rs, LLC*, 2010 WL 2432896, at *5 (Del. Ch. June 3, 2010) (transferring case back to Superior Court where it was originally filed); *Mass. Mut. Life Ins. v. Certain Underwriters at Lloyd's of London*, 2010 WL 3724745, at *4 (Del. Ch. Sept. 24, 2010) (same).

[60] Del. Const. art. IV § 13(2); *Employers Ins. Co. of Wausau v. Pinkerton's Inc.*, 2004 WL 1195369, at *1 (Del. Super. May 11, 2004) ("Subsequent to transfer . . . to the Court of Chancery, either party may petition for, or either court may *sua sponte* initiate, proceedings to consolidate the cases before one Judge or Chancellor in accordance with Article IV, Section 13(2) of the Delaware Constitution of 1897."). *See, e.g.*, *Caldera Properties-Lewes/Rehoboth VII, LLC v. Ridings Dev., LLC*, 2009 WL 2231716 (Del. Super. May 29, 2009) (Judge Graves presiding over consolidated case as both Superior Court Judge and Vice Chancellor by designation); *Reybold Venture Gp. XI-A, LLC v. Atl. Meridian Crossing, LLC*, 2009 WL 143107, at *6 n.44 (Del. Super. Jan. 20, 2009) (dismissing case for lack of subject matter jurisdiction but recommending appointment as Vice Chancellor by designation); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1989 WL 997183, at *3 (Del. Super. Sept. 29, 1989) (defendant moved to dismiss or transfer in favor of parallel litigation in Court of Chancery and Judge Martin denied the motion after being designated to sit in Chancery by designation); *New Castle Cty. v. Christiana Town Ctr., LLC*, 2004 WL 1835103 (Del. Ch. Aug. 16, 2004) (Judge Gebelein sitting as Vice Chancellor by designation); *Interim Healthcare, Inc. v. Spherion Corp.*, 2003 WL 22902879 (Del. Ch. Nov. 19, 2003) (then-Judge Slights sitting as Vice Chancellor by designation).

### III. CONCLUSION

Having found the Court of Chancery lacks subject matter jurisdiction to adjudicate defamation claims, Defendant's motion for summary judgment must be GRANTED, subject to Plaintiffs electing to have the matter transferred to the Superior Court.

**IT IS SO ORDERED.**